[No. B184276. Second Dist., Div. One. Jan. 8, 2007.]

AUGUST ENTERTAINMENT, INC., Plaintiff and Appellant, v.
PHILADELPHIA INDEMNITY INSURANCE COMPANY, Defendant and
Respondent.

**COUNSEL**

Law Offices of Christian J. Garris, Christian J. Garris; Law Offices of David M. Wolf and David M. Wolf for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Thomas G. Oesterreich and Elizabeth G. O'Donnell for Defendant and Respondent.

**OPINION**

**MALLANO, J.**—This appeal raises issues concerning whether a directors and officers (D&O) liability policy covers a breach of contract claim where an officer entered into a contract without stating that he was acting on behalf of the corporation. The corporation subsequently disputed liability under the contract, and the other contracting party brought suit against the corporation and the officer, seeking to recover the contract price. The officer sought a defense from the D&O insurer, which denied the claim. The corporation and the officer settled the suit for the contract price.

In this action against the insurer for bad faith, the trial court entered judgment for the insurer after sustaining a demurrer without leave to amend. We affirm because the D&O policy did not cover the corporation's contractual debt or the officer's liability for breaching a contract. The breach of the

contractual obligation asserted in this case did not give rise to a loss caused by a wrongful act within the meaning of the policy. Rather, the corporation was simply being required to pay an amount it voluntarily contracted to pay. To hold the insurer liable for the contract price would be tantamount to making it a business partner of the corporation and the officer, which was not the mutual intention of the insurer and the insured under the policy.

# I

## BACKGROUND

We accept as true the following allegations of the complaint. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

InternetStudios.com, Inc. (InternetStudios), produced, distributed and marketed filmed entertainment products. The company operated a Web site for marketing films. Robert Maclean was an officer of InternetStudios.

August Entertainment, Inc. (August Entertainment), acts as the exclusive sales agent for various principals who own or control the rights of exploitation to several motion pictures. Gregory Cascante was the president of August Entertainment.

In October 1999, Maclean and Cascante began negotiations—by telephone, meetings, and correspondence—concerning possible deals between InternetStudios and August Entertainment. On March 14, 2000, Cascante faxed a memo to Maclean on August Entertainment letterhead, proposing that InternetStudios offer a minimum guarantee of $2 million to August Entertainment for the distribution rights to certain films. The memo contained other proposed terms. Cascante ended the memo, "If this structure is of interest to [I]nternetstudios.com please call me with any questions you have." It was signed, "Thanks in advance, Gregory Cascante."

On March 24, 2000, Maclean sent a letter to Cascante on InternetStudios letterhead. Maclean referenced Cascante's earlier memo, stating, "[W]e are prepared to pay a minimum guarantee of 2 million dollars with respect to the [film] titles . . . attached hereto . . . [¶] . . . [¶] You can consider this a firm offer for the purchase of these rights subject only to verification of sales agency agreements and proof of lab access to the materials. Please provide us with confirmation of your acceptance of our offer." The letter was signed, "Yours truly, Rob Maclean."

Cascante received the letter and wrote on it, "On behalf of August Ent[ertainment] I accept your offer." He signed the letter and also wrote the date, "3/24/2000." Cascante returned the letter to Maclean.

In subsequent correspondence, InternetStudios informed August Entertainment that it would "not go forward with the proposed acquisition and distribution rights" outlined in Maclean's March 24, 2000 letter because "as a result of our due diligence, it became clear that InternetStudios was unable to actually acquire all of August's distribution rights in the subject films." InternetStudios proposed that Maclean and Cascante schedule a meeting "to see if it is possible to work out an arrangement between InternetStudios and August Entertainment." InternetStudios asserted that "there is no agreement in place between the parties and that . . . InternetStudios.com does not have any liability to [August Entertainment]." In contrast, August Entertainment insisted that a binding agreement existed.

A. *The Underlying Action*

In September 2000, August Entertainment filed an action against InternetStudios (*August Entertainment, Inc. v. InternetStudios.com, Inc.* (Super. Ct. L.A. County, 2000, No. BC235673)). After two demurrers, August Entertainment filed a second amended complaint in November 2000, alleging causes of action for breach of contract and anticipatory repudiation. InternetStudios was the only named defendant. Twenty Doe defendants were also included. The complaint alleged: (1) August Entertainment and InternetStudios were corporations; (2) on March 24, 2000, InternetStudios, "by and through its agent Maclean, made a written offer to August Entertainment to obtain a license of rights in [certain] Pictures"; and (3) August Entertainment, "by and through its agent, Gregory Cascante, . . . accepted InternetStudios' offer and entered into [a] contract with InternetStudios . . . concerning the license to InternetStudios of such rights of exploitation to the Pictures as were controlled by August [Entertainment]." August Entertainment alleged that it was owed $2 million under the contract. Eventually, InternetStudios filed an answer to the complaint.

In April 2001, August Entertainment filed a two-page "First Amendment to Second Amended Complaint," amending the name "InternetStudios" throughout the complaint to mean "InternetStudios.Com, Inc., Does 1 through 20, inclusive, and/or each or any of them." August Entertainment then served Maclean as Doe 1. Maclean answered the complaint.

By letter to InternetStudios dated September 5, 2001, August Entertainment explained its reasons for adding Maclean as a defendant. It argued that Maclean was personally liable for breach of contract because he did not state in his March 24, 2000 letter that he was signing on behalf of InternetStudios, and the letterhead he used did not indicate that InternetStudios was a corporation. According to August Entertainment, "the general rule is that an agent who signs a contract in his or her own name, rather than that of the

principal, becomes personally liable even though he or she intends to bind only the principal, since, by so acting, the agent makes the contract his or her own." (Citing *Sayre v. Nichols* (1855) 5 Cal. 487, 488.) August Entertainment suggested that perhaps Maclean had made a mistake in signing the letter in this manner, possibly entitling him to indemnity under his D&O insurance.

Philadelphia Indemnity Insurance Company (Philadelphia) had issued an "Executive Safeguard" policy to InternetStudios, effective April 10, 2000, to April 10, 2001. The policy consisted of four parts, numbered as follows: (1) "Directors and Officers Liability & Company Reimbursement Insurance"; (2) "Employment Practices Liability Insurance"; (3) "Fiduciary Liability Insurance"; and (4) "Special Risk Insurance." Part one provided $3 million in D&O coverage and contained two insuring agreements. Under "Insuring Agreement A," entitled, "Directors and Officers Liability Coverage," Philadelphia agreed to pay for any "loss" on behalf of an "insured" based on a claim first made during the policy period for a "wrongful act," except for a "loss" that InternetStudios had actually paid on behalf of the insured as indemnification.

"Insured" meant "any person who has been, now is or shall become a duly elected director or a duly elected or appointed officer of [InternetStudios]." "Loss" was defined as "[d]efense [c]osts and any money the insured is legally obligated to pay as damages or in settlement" but did not include criminal or civil fines, penalties imposed by law, taxes, matters uninsurable under the law, or punitive damages. "Wrongful act" meant any "actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed by an Insured, individually or otherwise, in [his or her] capacity as a director or officer of [InternetStudios]; or [¶] . . . matter claimed against an Insured solely in [his or her] capacity as such."

Under "Insuring Agreement B," entitled, "Company Reimbursement Coverage," Philadelphia agreed to pay on behalf of "the Company" (InternetStudios) any "loss" from a claim made during the policy period for "wrongful acts" by an "insured" to the extent that InternetStudios had indemnified an "insured" pursuant to law (common or statutory), contract, or InternetStudios's charter or bylaws. This coverage, unlike "Insuring Agreement A," excluded "any actual or alleged liability of the Company under any express contract or agreement."

On September 11, 2001, counsel for InternetStudios wrote to Philadelphia, making a claim under part one of the policy for D&O liability, not the company reimbursement coverage. Counsel enclosed a copy of the complaint and the letter from August Entertainment that explained Maclean's potential liability. Maclean's attorney also contacted Philadelphia.

By letter dated November 12, 2001, Philadelphia denied the claim. It denied coverage as to *InternetStudios*, relying on the exclusion for causes of action based on an express contract or agreement. It denied coverage as to *Maclean*, stating that his potential liability was based on actions he allegedly undertook in his individual capacity, not as an officer or director of InternetStudios. Philadelphia asserted it was not obligated to pay for any "loss" under the policy, including defense costs.

Meanwhile, InternetStudios had become insolvent. Shortly after Philadelphia denied coverage, InternetStudios, August Entertainment, and Maclean decided to settle the case. Pursuant to a written settlement agreement dated November 21, 2001, they agreed: (1) Maclean was acting as an officer of InternetStudios when he wrote the March 24, 2000 letter to Cascante; (2) Maclean and InternetStudios intended that InternetStudios alone be bound by the offer in the letter; (3) InternetStudios and Maclean owed August Entertainment $2 million under the resulting contract; (4) August Entertainment would dismiss its claims against InternetStudios; (5) Maclean would pay August Entertainment $2 million plus presettlement interest; (6) Maclean would assign to August Entertainment all of his rights and claims against Philadelphia under the insurance policy; (7) subject to narrow exceptions, August Entertainment would look solely to its recovery against Philadelphia, if any, in satisfaction of Maclean's payment; and (8) under certain circumstances, judgment would be entered against Maclean for $2 million plus interest. On July 8, 2002, pursuant to stipulation, judgment was entered against Maclean in the amount of $2,162,500.

## B. *The Present Action*

In October 2004, August Entertainment filed this action against Philadelphia, alleging claims for breach of contract, breach of the covenant of good faith and fair dealing, and fraud. Each cause of action was based on Philadelphia's denial of Maclean's insurance claim and its failure to indemnify him for the amount of the judgment.

Philadelphia filed a demurrer, contending that the policy afforded no potential for coverage because Maclean's alleged liability was based on conduct he committed in his individual capacity. August Entertainment filed opposition, arguing that coverage existed because Maclean had committed a "wrongful act" within the meaning of the policy by mistakenly signing the contract without stating he was an agent of InternetStudios. The trial court sustained the demurrer with leave to amend, explaining, "Broken down to its essentials, this is an attempt to force the insurance company to pay for a corporate breach of contract."

August Entertainment filed a first amended complaint substantially similar to the first one. Philadelphia demurred on the same ground as before. August Entertainment filed opposition. The trial court sustained the demurrer without leave to amend, stating, "What plaintiff is seeking to do is have an insurance company pay for a business debt under an [errors and omissions] policy where the alleged wrongful act of the officer consists of signing a contract without indicating he is signing as an officer of the corporation." Judgment was entered in favor of Philadelphia. August Entertainment appealed.

## II

## DISCUSSION

In reviewing the ruling on a demurrer, "we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed.' . . . When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318, citations omitted; accord, Code Civ. Proc., § 452.)

■ "Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. . . . 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. ". . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. . . . The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' . . . , controls judicial interpretation." ' " (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647–648 [3 Cal.Rptr.3d 228, 73 P.3d 1205], citations omitted.) The goal is to give effect to the reasonable expectations of both the insured and the insurer. (See *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 756–757, 759 [27 Cal.Rptr.3d 648, 110 P.3d 903]; *California Automobile Ins. Co. v. Hogan* (2003) 112 Cal.App.4th 1292, 1299 [5 Cal.Rptr.3d 761].)

■ D&O insurance is "a specialized form of coverage for (i) claims against corporate directors and officers based on acts committed in their corporate capacities; [and] (ii) the corporation's indemnification obligations to its directors and officers for such claims . . . . [¶] . . . [¶] [U]nlike general liability insurance, which is typically written on standard forms, D&O policy provisions often vary depending on a number of factors, including the nature of the insured's business, the insured's financial condition, and [the] insured's status as a public or private company. Cases must therefore be reviewed in

the context of the specific policy language at issue. . . . . [¶] . . . [¶] The availability of such insurance is important in attracting persons to serve as directors and officers of corporations." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶¶ 7:1550 to 7:1552, p. 7F-1; see generally Troy & Gould, Advising and Defending Corporate Directors and Officers (Cont.Ed.Bar 2006) §§ 12.1–12.118, pp. 447–510 (Troy & Gould) [discussing D&O liability insurance].)

█  As provided by statute: "A corporation shall have power to purchase and maintain insurance on behalf of any agent of the corporation against any liability asserted against or incurred by the agent in that capacity or arising out of the agent's status as such whether or not the corporation would have the power to indemnify the agent against that liability under this section." (Corp. Code, § 317, subd. (i).) This statute permits, but does not require, a corporation to purchase whatever D&O insurance may be available on the market. (See 1 Marsh's Cal. Corporation Law (4th ed. 2006) § 11.23, p. 11-226.) The availability of coverage is "governed by insurance law and public policy applicable to insurance contracts and by the willingness of the carriers . . . to write particular types of policies." (*Id.*, § 11.23, pp. 11-226 to 11-227.) The statute does not authorize an insurance company to cover a risk that it could not lawfully cover in the statute's absence. (*Id.*, § 11.23, p. 11-227.) For instance, a D&O policy cannot insure against willful wrongdoing. (*Id.*, § 11.23, p. 11-226; Troy & Gould, *supra*, § 12.9, pp. 452–453.)

D&O policies generally do not contain a duty to defend, but the insurer is usually obligated to pay defense costs as part of the "loss." (See *Gon v. First State Ins. Co.* (9th Cir. 1989) 871 F.2d 863, 867–868 & fn. 2; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 7:1557, 7:1613, pp. 7F-2, 7F-22.) " '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. . . . "[T]he carrier must defend a suit which potentially seeks damages within the coverage of the policy." . . . Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded.' " (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153], citations and italics omitted.)

Although August Entertainment's pleadings and opening brief on appeal make passing reference to the duty to defend, the gist of its argument is that Philadelphia is liable under the D&O insurance for August Entertainment's judgment against Maclean, that is, for indemnity. The question, therefore, is whether actual, not potential, coverage existed. (See *Buss v. Superior Court* (1997) 16 Cal.4th 35, 46–47 & fn. 10 [65 Cal.Rptr.2d 366, 939 P.2d 766]; *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1045 [123 Cal.Rptr.2d 256].)

One California case has addressed the issue before us. In *Oak Park Calabasas Condominium Assn. v. State Farm Fire and Casualty Co.* (2006) 137 Cal.App.4th 557 [40 Cal.Rptr.3d 263] (*Oak Park*), a condominium association contracted with a construction company to repair damage caused by the 1994 Northridge earthquake. The association later refused to pay the entire amount due under the contract. The construction company filed suit. The association tendered defense of the action to its D&O insurer under a policy that defined " 'wrongful acts' " as " 'any negligent acts, errors, omissions or breach of duty.' " (*Id.* at p. 562.) The insurer denied the claim, stating that the policy covered torts and not " 'a contractual obligation of the type set forth in this lawsuit.' " (*Id.* at p. 560.) At trial, the construction company recovered a $4.1 million judgment against the association.

The association then sued its insurer for breach of the policy. The case was tried to the court, which found in favor of the insurer. On appeal, the association argued that the term "wrongful acts" was not limited to negligent conduct but included errors such as breach of contract. The insurer contended that the policy covered only torts.

The Court of Appeal held for the insurer, explaining the implications of the association's argument: "[The parties] engaged in exotic rules of grammar to argue their respective positions on appeal, but we see no reason to resort to such devices in resolving the matter. First it appears to this court that if [the association's] construction of the policy were correct, any condominium association could choose to enter a reconstruction, remodeling or renovation contract with a contractor, then decide not to pay the bill, thus shifting the obligation to its insurer. No rational insurer would wish to undertake such an insuring obligation. It would be literally impossible, from an actuarial standpoint, to set appropriate premiums to guard against the risk that an association would enter into multimillion-dollar construction contracts, and then not pay for the construction work. That type of risk would be virtually impossible to underwrite.

"Second this court is convinced that the concept of fortuity requires a disposition that favors [the insurer]. [The association] has alleged nothing which was unanticipated from the standpoint of its position as an insured. The contract that [the association] entered into was voluntary . . . . [The association] simply chose not to pay all the money due and owing to [the construction company]." (*Oak Park, supra,* 137 Cal.App.4th at p. 565.)

A similar analysis applies in this case. If we accept August Entertainment's line of reasoning, D&O insurers could be held liable for *corporate* debts based on the way in which an officer signs a contract on behalf of the corporation, for example, by failing to include "Inc." in the company name or

omitting "by" before his or her signature. (See *Otis Elevator Co. v. Berry* (1938) 28 Cal.App.2d 430, 432–433 [82 P.2d 704] [discussing doctrine of undisclosed principal]; *Carlesimo v. Schwebel* (1948) 87 Cal.App.2d 482, 486–489 [197 P.2d 167] [same]; *Ikerd v. Warren T. Merrill & Sons* (1992) 9 Cal.App.4th 1833, 1837–1841 & fns. 5, 6 [12 Cal.Rptr.2d 398] [same]; 3 Witkin, Summary of Cal. Law (10th ed. 2005) §§ 197–198, pp. 249–251 [same].)

■ Yet, D&O policies typically exclude coverage for breach of contract. Here, under Insuring Agreement B, the policy expressly excluded actual or alleged liability of the *company* for breach of contract. And, under Insuring Agreement A, the policy limited coverage for *directors and officers* to liability arising from errors committed in their official capacity, which effectively excluded contract liability for two reasons. First, an officer acting in an official capacity cannot be held liable for breach of a corporate contract. (See *Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1087, 1089–1090 [32 Cal.Rptr.3d 483, 116 P.3d 1162]; *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 [99 Cal.Rptr.2d 824]; 3A Fletcher Cyclopedia of the Law of Private Corporations (2002 rev.) § 1117, pp. 153–156; *id.* (2006 supp.) § 1117, p. 30; 1 Marsh's Cal. Corporation Law, *supra*, § 10.16, pp. 10-90 to 10-92.) Second, an officer who breaches a contract in an individual capacity is excluded from coverage because he or she was not acting in an official capacity. (See *Barnett v. Fireman's Fund Ins. Co.* (2001) 90 Cal.App.4th 500, 512–513 & fns. 7, 8 [108 Cal.Rptr.2d 657]; *Nat. Union Fire Ins. of Pittsburgh v. Brown* (S.D.Fla. 1991) 787 F.Supp. 1424, 1431, affd. mem. (11th Cir. 1992) 963 F.2d 385; see also *Plate v. Sun-Diamond Growers* (1990) 225 Cal.App.3d 1115, 1126 [275 Cal.Rptr. 667] [employees were not entitled to statutory indemnification from corporation where they allegedly acted in individual capacity].)

According to the "facts" recited in the underlying settlement agreement, InternetStudios authorized Maclean, on its behalf, to make a contract offer to August Entertainment that would bind InternetStudios alone. But after August Entertainment sought to enforce the resulting contract, InternetStudios ultimately took the position that because of the manner in which Maclean had made the offer, the D&O insurance provided coverage for the entire contract price, essentially making the insurer an unwitting investor in the deal. ·

Here, similar to *Oak Park*, a corporation intentionally entered into a contract, decided not to make payment on it, and looked to its D&O insurer for a bailout. As *Oak Park* recognized, this is not the type of claim covered by D&O insurance. We acknowledge, however, that while the legal analysis in *Oak Park* is applicable here, that decision could be distinguished factually because the condominium association's policy limited "wrongful acts" to

negligence while the definition of "wrongful acts" in this case is broader in scope. Thus, *Oak Park* is not precisely on point.

■ "[T]here are few California appellate decisions dealing with D&O policies. As a consequence, California courts often look to decisions of California federal courts and out-of-state cases in resolving coverage issues and interpreting policy provisions." (*Oak Park, supra,* 137 Cal.App.4th at p. 564; accord, Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:1559, pp. 7F-2 to 7F-3.)

In *American Casualty v. Union Welfare Fund* (1997) 113 Nev. 764 [942 P.2d 172], the international trustees of a union trust fund merged assets with a local fund and agreed as part of the merger to defend and indemnify the local fund for any claims brought against it. The local fund was later sued, but the international trustees refused to provide a defense. The local fund paid its own defense costs and prevailed in the litigation. In a second action, the local fund sued the international trustees to recover its defense costs, alleging a breach of the merger agreement. The international trustees, in turn, sought a defense from their insurer, American Casualty, under a policy that defined "loss" and "wrongful acts" in language virtually identical to the policy at issue here. (See *id.* at p. 769 [942 P.2d at pp. 175–176].) American Casualty provided the international trustees with a defense. Nevertheless, the local fund recovered a judgment against the international trustees, resulting in a settlement of $750,000. American Casualty refused to pay for the settlement.

The international trustees and American Casualty litigated the indemnity issue in a declaratory relief action. The district court found for the trustees. The Nevada Supreme Court reversed, explaining: "American contends correctly that the judgment against it in this case represents an amount that cannot be properly considered a 'loss' resulting from any 'wrongful act' of the international trustees. The policy provides that American agrees that 'if claim or claims are . . . first made against the Insureds [i.e., the international trustees], individually or collectively during the policy year for *a Wrongful Act,* [then American Casualty] will pay on behalf of the Insureds all loss which said Insureds shall be legally obligated to pay.' . . . Although a loss is defined very broadly to include almost any amount awarded against the insureds, the issue in this case is not the definition of 'loss,' or whether the damages in this case could fall within that definition. Instead, the issue is whether the judgment which the international trustees were required to pay was a 'loss' that *resulted from* any 'wrongful act' of the international trustees. Simply put, the policy only covers loss resulting from wrongful acts, whether actually committed or merely alleged.

"American argued in the district court and in its briefs in this court that the policy did not cover the loss in this case because the loss . . . did not result

from any 'wrongful act' of the international trustees; the 'loss' was not a loss at all; it was merely the judicial enforcement of the international trustees' contractual obligations to the local [fund] under the merger agreement. American argues that it never agreed to pay the international trustees' obligations under the merger agreement[,] an obligation for which the international trustees were fully paid [by the local fund under that agreement].

"The 'loss' in this case did not result from any actual or alleged 'wrongful act' of the international trustees. The 'wrongful act' was the failure to defend. . . . This failure to defend did not result in the local [fund's] costs in defending the third party action against [it], because the costs involved in defending the third party suit would have been incurred whether or not the international trustees had committed the wrongful act of failing to defend the local [fund]. Although the local [fund] initially paid the costs of defending against the third party suit, the international trustees were contractually obligated to bear those costs. Had the international trustees not committed the wrongful act of failing to defend the local [fund], *i.e.*, had the international trustees elected to honor their obligation and defend the local [fund], the international trustees would have been obligated to pay the cost of the defense, and they would not have been in a position to pass their legal obligation on to their insurance carrier. It is the cost of this defense that was reduced to a judgment in the . . . action against the international trustees.

"The international trustees were required to pay their contractual obligation. This contractual obligation did not result from their wrongful act of refusing to satisfy it. To hold otherwise would allow an insured to turn all of its legal liabilities into insured events by the intentional act of refusing to pay them. The refusal to pay an obligation simply is not the cause of the obligation, and the international trustees' wrongful act in this case did not result in their obligation to pay; their contract imposed on them the obligation to pay. [¶] . . . [¶]

"American did not insure the international trustees against debts they are obligated to pay pursuant to the merger agreement with the local [fund]. Because the judgment of the district court is based on a theory that the contractual obligation of the international trustees under the merger agreement is covered as a loss under the policy, we must reverse that judgment." (*American Casualty v. Union Welfare Fund, supra,* 113 Nev. at pp. 769–771 [942 P.2d at pp. 176–177], fns. omitted.) In short, an insured's alleged or actual refusal to make payment under a contract does not give rise to a loss caused by a wrongful act.

In *Toombs NJ Inc. v. Aetna Cas. & Sur.* (1991) 404 Pa.Super. 471 [591 A.2d 304], a corporation negotiated with an individual to build and operate two restaurants. The corporation later sought to back out of the deal, resulting in a suit by the individual for breach of contract. The corporation sought a defense under a comprehensive general liability (CGL) policy. The court found no coverage, stating: "To allow indemnification under the facts presented here would have the effect of making the insurer a sort of silent business partner subject to great risk in the economic venture without any prospects of sharing in the economic benefit. The expansion of the scope of the insurer's liability would be enormous without corresponding compensation." (*Id.* at pp. 475–476 [591 A.2d at p. 306].) There would be no financial consequences to an insured who decided to breach a contract, which is inimical to the concept of insurance. (See *Waste Corp. of America, Inc. v. Genesis Ins. Co.* (S.D.Fla. 2005) 382 F.Supp.2d 1349, 1354–1355.)

■ As noted in a leading treatise: "Professional liability policies often contain an exclusion for '[a]ny "claim" arising out of a breach of contract, or out of liability assumed under any contract or agreement.' *Even in the absence of an express exclusion*, courts have held that a claim alleging breach of contract is not covered under a professional liability policy because there is no 'wrongful act' and no 'loss' since the insured is simply being required to pay an amount it agreed to pay." (23 Appleman on Insurance 2d (Holmes ed. 2003) § 146.6[I], pp. 120–121, italics added, fn. omitted.)

August Entertainment contends that coverage existed here because Maclean was negligent in the way he made the contract offer. But the mere existence of a mistake or negligent act does not create coverage under the policy for breach of contract. In *Baylor Heating & Air v. Federated Mut.* (7th Cir. 1993) 987 F.2d 415 (*Baylor*), an employer ceased making pension fund payments under a collective bargaining agreement when the agreement expired, believing its obligation to make the payments terminated with the agreement. The employer acted on the advice of counsel. In subsequent litigation, the pension fund obtained a judgment against the employer for the unpaid contributions. The employer sued its insurer for indemnity under a policy providing coverage for injury or damage caused by negligent acts or omissions in the administration of employee benefit programs.

The court concluded that there was no coverage, explaining: "The multi-cover liability endorsement does not provide coverage for all sums which [the employer] must pay to the Fund but only those arising from a 'negligent act, error, or omission.' [The employer] contends that it 'did not set out purposely to avoid [its] contractual obligations.' . . . Although this may be true, it misses the point. Our inquiry is not directed toward [the employer's] motives. . . . In addition, it is irrelevant that [the employer] acted pursuant to [its attorney's]

advice. Although [the attorney] may have been mistaken, or even negligent . . . , this does not convert [the employer's] intentional act in refusing to further honor the collective bargaining agreement into a negligent one.

"[The employer's] liability to the pension fund is contractual. Although at the time [the employer] refused to make fund payments it did not believe it had any contractual obligation to do so, these beliefs do not change the contractual nature of the obligation. The Fund was awarded amounts owed pursuant to the collective bargaining agreement, not damages for negligence, and these payments are not covered by [the insurance] policy. . . . [E]ven though the insured's actions in precipitating the breach may have been careless, they were not covered by the policy. . . .

". . . Under [the employer's] logic, any default arising from a mistaken assumption regarding one's contractual liability could be transformed into an insured event. Indeed, refusing to pay a debt in reliance upon erroneous advice of counsel would convert a contractual debt into damage arising from a negligent omission. We dare not imagine the creative legal theories treading just short of malpractice and frivolity that could seek to transform contract obligations into insured events." (*Baylor, supra,* 987 F.2d at pp. 419–420, citation and fns. omitted.)

*Baylor* was followed in *Pacific Ins. Co. v. Eaton Vance Management* (1st Cir. 2004) 369 F.3d 584. There, an employer adopted new documents for its profit sharing plan without realizing that the documents broadened the eligibility criteria for employees. Unaware of the change in language, the employer failed to extend the plan to other employees and did not pay the additional funds. Upon learning of its mistake, the employer corrected the error and paid the amounts due. It then looked to its errors and omissions insurer for reimbursement. The policy covered a loss or liability incurred by reason of any actual or alleged failure to discharge the employer's duties or to act prudently under federal law governing employee benefit plans or by reason of any actual or alleged breach of fiduciary responsibility under the same law.

The employer argued that coverage existed because it failed to administer the plan in accordance with its terms, which was a breach of fiduciary duty under federal law. The court disagreed, concluding that the employer was required to pay the additional funds because it had agreed to the new plan documents, not because it breached a fiduciary duty: "[T]he relevant liability for which [the employer] seeks recovery from its insurer is *not* one for breach of fiduciary duty relative to the belatedly funded employee accounts; rather, [the employer] seeks reimbursement for amounts it paid . . . in satisfaction of its Plan-created obligation to establish and fund those accounts to the level

they would have attained had [the employer] initially complied with the Plan. So understood, the cause of this obligation cannot be the breach of the obligation; instead, in our view, this obligation derived from the broadened eligibility criteria in the 1984 documents themselves (as now interpreted by [the employer]) . . . . [¶] . . . [¶]

"[T]hat the alleged breach of fiduciary duty resulted in the late payment of funds does not alter the essential fact that the liability was 'incurred . . . by reason of' the adoption of the 1984 documents . . . . The insurance policy at issue covers debts 'incurred . . . by reason of,' *inter alia*, a breach of fiduciary duty; it does not cover debts that are 'incurred' through a contractual obligation . . . ." (*Pacific Ins. Co. v. Eaton Vance Management, supra,* 369 F.3d at pp. 590–591.) Thus, a multiperil insurance policy providing coverage for negligence would not cover a claim that the insured "forgot to pay its bills." (*Cincinnati Ins. Co. v. Metropolitan Properties* (11th Cir. 1986) 806 F.2d 1541, 1543.)

Similarly, in *May Dept. Stores Co. v. Federal Ins. Co.* (7th Cir. 2002) 305 F.3d 597, participants in a pension plan sued their employer for failing to make payments required by the plan. The corporation settled with the participants. It then brought an action against its insurer under an "executive protection policy," contending that the policy covered the settlement. The Seventh Circuit rejected that contention. As Judge Posner noted: "It would be passing strange for an insurance company to insure a pension plan (and its sponsor) against an underpayment of benefits, not only because of the enormous and unpredictable liability to which a claim for benefits on behalf of participants in . . . a pension plan of a major employer could give rise, but also because of the acute moral hazard problem that such coverage would create. ('Moral hazard' is the term used to denote the incentive that insurance can give an insured to increase the risky behavior covered by the insurance.) Such insurance would give the plan and its sponsor an incentive to adopt aggressive (just short of willful) interpretations of [federal pension law] designed to minimize the benefits due, safe in the belief that if, as would be likely, the interpretations were rejected by the courts, the insurance company would pick up the tab. Heads I win, tails you lose." (*Id.* at p. 601.)

Based on the foregoing authorities, we conclude that, under the policy in this case, the insurer was not liable for the underlying settlement or judgment. To hold otherwise would make it a de facto party to a corporate contract and require it to pay the *full* contract price (plus interest), letting the corporation completely off the hook. Performance of a contractual obligation—here the payment of $2 million—is a debt the corporation voluntarily

accepted. It is not a loss resulting from a wrongful act within the meaning of the policy.

When the D&O policy was issued, neither the insurer nor the insured could have reasonably expected that insurance benefits would be available to cover the contract price of a business deal gone wrong. Such an expectation would expand the scope of the insurer's liability enormously and unpredictably without corresponding compensation. (See *Toombs NJ Inc. v. Aetna Cas. & Sur.*, *supra*, 404 Pa.Super. at p. 476 [591 A.2d at p. 306].) And it would create a moral hazard problem, encouraging corporations to risk a breach of their contractual obligations, knowing that, in the event of a breach, the D&O insurer would ultimately be responsible for paying the debt. (See *May Dept. Stores Co. v. Federal Ins. Co.*, *supra*, 305 F.3d at p. 601.)

Maclean's role in the transaction turns out to be a nonissue. In his capacity as an officer, he cannot be held liable for breach of a corporate contract. If he was acting in his individual capacity in breaching the contract, the D&O insurance did not cover any of his acts or omissions, much less a refusal to honor a $2 million commitment. And regardless of how the contract was *formed*—even if Maclean acted for an undisclosed principal and was thus personally liable—the failure to pay the contract price, as already explained, was not a loss caused by a wrongful act.

Finally, if the insurer in this case had wanted to cover a breach of contract, it certainly knew how to do so. Under part two of the policy, entitled "Employment Practices Liability Insurance," the term "wrongful act" was defined to cover several types of employment-related conduct, *including* "breach of a written or oral employment contract or quasi-employment contract." But, as stated, "wrongful act," as defined in part one, the D&O liability insurance, did not include a breach of contract of any kind—all the more reason why an officer could not reasonably expect the D&O coverage to apply to a contract claim, whether sued in an individual or official capacity.

Nevertheless, August Entertainment points out that the D&O insurance contained an *exclusion* that mirrored everything that was covered by the employment practices insurance. Thus, the D&O coverage expressly excluded claims for breach of a written or oral employment contract or quasi-employment contract. From this, August Entertainment contends that the D&O insurance, by implication, must have included all *nonemployment* contract claims. Not so.

As we have stated, under the insuring provisions of the D&O coverage, the refusal to make payment on a contract was not a loss resulting from a wrongful act. And an exclusion from that coverage—for employment contracts—did not expand the insuring provisions beyond their original scope.

(See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16 [44 Cal.Rptr.2d 370, 900 P.2d 619] [before considering exclusions, court must examine coverage provisions to determine whether claim falls within policy terms]; *Elysian Investment Group v. Stewart Title Guaranty Co.* (2002) 105 Cal.App.4th 315, 324 [129 Cal.Rptr.2d 372] [" 'an exclusion cannot act as an additional grant or extension of coverage' "]; *Ray v. Valley Forge Ins. Co.* (1999) 77 Cal.App.4th 1039, 1048 [92 Cal.Rptr.2d 473] ["policy exclusions do not create coverage"]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 3:130, 4:399, pp. 3-41, 4-45 [exclusion does not enlarge coverage beyond insuring clause].) Here, the exclusion simply made clear that no employment-related claims were covered under the D&O insurance. A higher premium was required for the additional protection afforded by the employment practices insurance, which covered not only the breach of an employment contract but also the violation of antidiscrimination laws, invasion of privacy, workplace harassment, wrongful termination, wrongful discipline, and wrongful failure to promote.

Our decision is consistent with *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229] (*Vandenberg*). There, a property owner sued a lessee for contamination of the soil and groundwater, alleging several causes of action, including one for breach of the lease. The lessee sought a defense and indemnity from its insurers under CGL policies. The insurers denied the claim. In subsequent litigation on the policies, the trial court found for the insurers. The Supreme Court granted review to decide "whether CGL policy language indicating coverage for sums the insured becomes 'legally obligated to pay as damages' can include losses pled as breach of contract." (*Id.* at p. 828.)

In deciding that coverage could exist under such language, the court stated: "A reasonable layperson would certainly understand *'legally obligated to pay'* to refer to any obligation that is binding and enforceable under the law, whether pursuant to contract or tort liability. Further, a reasonable layperson, cognizant that he or she is purchasing a *'general liability'* insurance policy, would not conclude such coverage term only refers to liability pled in tort, and thus entirely excludes liability pled on a theory of breach of contract. Under general insurance principles, [courts] must interpret the phrase 'legally obligated to pay as damages' in accordance with the ordinary and popular sense, not the legalistic [sense]." (*Vandenberg, supra,* 21 Cal.4th at p. 840, italics added.)

Yet, *Vandenberg* did not hold that contract damages were definitely recoverable under CGL policies, noting that a breach of contract claim would still be subject to limitations imposed by other terms of the policies—" 'bodily injury and property damage as defined, caused by an occurrence.' "

(*Vandenberg, supra*, 21 Cal.4th at p. 841; see *Burlington Ins. v. Oceanic Design & Const.* (9th Cir. 2004) 383 F.3d 940, 950 [discussing limited nature of holding in *Vandenberg*].)

■ And *Vandenberg* recognized that "[p]redicating coverage upon an injured party's choice of remedy or the form of action sought is not the law of this state." (*Vandenberg, supra*, 21 Cal.4th at p. 840.) Instead, coverage is determined by "the nature of the risk and the injury, in light of the policy provisions." (*Ibid.*) In *Vandenberg*, the risk and injury involved the contamination of the soil and groundwater in violation of the duties imposed by a lease, examined in light of policy language in a CGL policy covering "damages" the insured was "legally obligated to pay."

Here, the risk and injury concern a debt arising from a corporation's or officer's breach of a corporate contract viewed in light of a D&O policy covering a "loss" caused by a "wrongful act." Applying the test set forth in *Vandenberg*, we have concluded above that coverage did not exist for the failure to pay the contract price. "The policy, after all, is a Directors' and Officers' liability policy . . . ; it is not an expanded comprehensive liability policy insuring the [corporation] against liability for everything it does." (*Olympic Club v. Underwriters at Lloyd's London* (9th Cir. 1993) 991 F.2d 497, 500; accord, *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132, 1146 [72 Cal.Rptr.2d 467].)

We do not suggest that officers who make seemingly minor scrivener errors must face financial ruin if they fail to disclose their principal. The question before us involves coverage under a particular D&O policy. Broader coverage may be available. (See, e.g., *Clement v. Smith* (1993) 16 Cal.App.4th 39, 42, 47–48 [19 Cal.Rptr.2d 676] [officer would have been covered for breach of contract if insurance agent had obtained "contractual liability" policy that officer had requested for specific construction project]; *Russ-Field Corp. v. Underwriters at Lloyd's* (1958) 164 Cal.App.2d 83, 88, 96–98 [330 P.2d 432] [insurer held liable for defense costs and indemnity where errors and omissions policy covered "breach of contract rights" arising out of production of motion pictures].) And an officer is statutorily entitled to indemnification from the corporation in certain circumstances. (See Corp. Code, § 317; Lab. Code, § 2802, subd. (a).) Finally, the parties have not addressed the application of the undisclosed principal doctrine to the facts of this case, so we express no opinion as to whether Maclean was actually liable under the contract. (See *Carlesimo v. Schwebel, supra*, 87 Cal.App.2d at pp. 486–489 [extrinsic evidence admissible to show agent not personally liable where contract is ambiguous as to whether agent acted for principal].)

## III

## DISPOSITION

The judgment is affirmed.

Spencer, P. J., concurred. Vogel, J., concurred in judgment only.

A petition for a rehearing was denied February 1, 2007, and appellant's petition for review by the Supreme Court was denied April 11, 2007, S150353. George, C. J., did not participate therein.