**SCREEN ACTORS GUILD INC., Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY., et al., Defendants.**

**Case No. CV 11–07123 DMG (VBKx).**

United States District Court, C.D. California.

July 11, 2013.

Jason E. Goldstein, Steven Joel Brower, Buchalter Nemer APC, Irvine, CA, for Plaintiff.

Andrea N. Myers, James R. Thompson, Michael G. Nardi, Seltzer Caplan McMahon Vitek ALC, San Diego, CA, for Defendants.

## ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT [DOC. ## 14, 18] AND MOTION TO SUBSTITUTE PARTY PLAINTIFF [DOC. # 34]

DOLLY M. GEE, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment [Doc. ## 14, 18] and Plaintiff Screen Actors Guild, Inc's ("SAG") motion to substitute party plaintiff [Doc. # 34]. For the reasons set forth below, SAG's motion for summary judgment is DENIED and Defendant Federal Insurance Company's ("Federal") motion for summary judgment is GRANTED. SAG's motion to substitute party plaintiff is GRANTED.

## I.

### *PROCEDURAL HISTORY*

SAG filed a complaint in the Los Angeles County Superior Court on July 22, 2011, alleging breach of contract and tortious breach of the covenant of good faith and fair dealing. Federal removed the action to this Court on August 29, 2011 on the basis of diversity jurisdiction.

Federal filed a motion for summary judgment on April 9, 2012 [Doc. # 14] and SAG filed a cross-motion for summary judgment on April 10, 2012 [Doc. # 18]. The parties filed their respective oppositions on April 27, 2012 [Doc. ## 24, 25] and their respective replies on May 4, 2012 [Doc. ## 26, 27]. Plaintiff filed a supplemental brief on May 22, 2012 [Doc. # 29]. The parties filed supplemental briefs on July 24, 2012 [Doc. ## 32, 33].

On June 13, 2013, SAG filed a motion to substitute party plaintiff, set for hearing on July 12, 2013 [Doc. # 34]. On June 21, 2013, Federal filed a notice of conditional nonopposition to the motion [Doc. # 35].

## II.

### *FACTUAL BACKGROUND*

The parties agree that the facts material to this Court's decision are not in dispute.

### A. *The Insurance Policy that Federal Issued to SAG*

Federal issued to SAG a policy of liability insurance for the period of March 1, 2007 to March 1, 2008, Policy No. 6802–1737 ("Policy"). (Federal's Statement of Genuine Disputes ("Federal's Disputes") [Doc. # 24–1] ¶ 1.) The Policy includes a "Directors & Officers Liability and Entity Liability Coverage Section," Insuring Clause 3, which provides as follows:

> The Company shall pay, on behalf of the **Organization, Loss** which the **Organization** becomes legally obligated to pay on account of any **Claim** first made against the **Organization** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** committed, attempted, or allegedly committed or attempted by the **Organization** or the **Insured Persons** before or during the Policy Period, but only if such **Claim** is reported to the Company in writing in the manner and within the time provided in Subsection 6 of the General Terms and Conditions.

(*Id.* ¶¶ 4–5; Decl. of Steven Brower ("Brower Decl.") [Doc. # 18–3] ¶ 3, Ex. A at 29; emphasis in original.)

The Policy defines "Claim" as:

(a) a written demand for monetary damages or non-monetary relief;

(b) a civil proceeding commenced by the service of a complaint or similar pleading;

(c) a criminal proceeding commenced by the return of an indictment; or

(d) a formal civil administrative or civil regulatory proceeding commenced by the filing of a notice of charges or similar document, or by the entry of a formal order of investigation or similar document, but only while such proceeding is also pending against an **Insured Person.**

(Brower Decl. ¶ 3, Ex. A at 30; emphasis in original.)

"Defense Costs" are defined as:

reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of the directors, officers, trustees or any duly constituted committee member or **Employees** of the **Organization**) incurred in defending any **Claim** and the premium for appeal, attachment or similar bonds.

(*Id.*; emphasis in original.)

"Loss" is defined in pertinent part as "the amount that any Insured becomes legally obligated to pay on account of any covered Claim, including but not limited to . . . (ii) judgments; (iii) settlements; . . . [and] (vi) **Defense Costs.**" (*Id.* at 31; emphasis in original.)

The Policy defines "Wrongful Act" as:

(a) any error, misstatement, misleading statement, act, omission, neglect, breach of duty, **Personal Injury Wrongful Act** or **Publisher Wrongful Act** committed, attempted, or allegedly committed or attempted by an **Insured Person** in his or her **Insured Capacity** or, for purposes of coverage under Insuring Clause 3, by the **Organization;**

(b) any other matter claimed against an **Insured Person** solely by reason of his or her serving in an **Insured Capacity;** or

(c) any **Outside Capacity Wrongful Act.**

(*Id.* at 33; emphasis in original.)

The Policy lists a number of exclusions to coverage. Section 5(j)(ii) provides that Federal shall not be liable for Loss on account of any Claim "made against any Insured based upon, arising from, or in consequence of . . . (ii) such **Insured** having gained in fact any profit, remuneration or advantage to which such **Insured** was not legally entitled." (*Id.* at 35; emphasis in original.)

## B. *The Osmond Action*

On September 18, 2007, Ken Osmond, an actor and SAG member, filed a civil complaint, on behalf of himself and all others similarly situated, against SAG in the Los Angeles Superior Court, Case No. BC 377780 (the "Osmond Action"). (Federal's Disputes ¶ 12; Brower Decl. ¶ 4, Ex. B ("Osmond Complaint").) Osmond alleged four causes of action, including conversion, unjust enrichment, accounting, and violation of Cal. Bus. & Prof.Code § 17200 *et seq. See generally* Osmond Complaint.

According to Osmond, since at least 1996, SAG had been collecting monies due actors from various foreign countries and, as of the date of the complaint, SAG had collected more than $8,123,000 in these "foreign levy funds." (Osmond Complaint ¶ 7.) Osmond alleged that SAG "intentionally collected and took possession of" the funds and held the funds for an "unreasonably long period of time," and that he and the plaintiff class were entitled to possession of their share of the foreign levy funds. (*Id.* ¶ 25–28.) Osmond sought restitutionary relief, compensatory and punitive damages, an accounting, a constructive trust, costs, reasonable attorneys' fees, prejudgment interest, and injunctive relief. (SAG's Statement of Genuine Disputes

("SAG's Disputes") [Doc. #.25–1] ¶¶ 23–24.)

## C. *SAG's Tender and Federal's . Response*

SAG tendered the Osmond suit to Federal on or about October 15, 2007. (Federal's Disputes ¶ 13; SAG's Disputes ¶ 43.) By a letter dated January 23, 2008, "Federal agree[d] to provide Defense Cost coverage," but stated that "there is no coverage for indemnity." (Federal's Disputes ¶ 15; Decl. of Brian Pudenz ("Pudenz Decl.") [Doc. # 14–3] ¶ 6, Ex. 6 [Doc. # 15] at 55.) In the January 23, 2008 letter, Federal also reserved the right to deny coverage "on additional and alternative bases as other terms, conditions, limitations, exclusions, endorsements and provisions of the policy, including representations, statements, declarations and omissions in connection with the application therefore [sic], are found to be applicable." (Pudenz Decl. ¶ 6, Ex. 6 at 56.)

On or about September 3, 2010, SAG provided Federal with a draft settlement agreement for the Osmond Action and, in an email, stated, "As previously noted we are not asking for agreement to coverage. We are only asking for affirmation that SAG has satisfied the 'no action' clause." (Brower Decl. ¶ 7, Ex. 3.) In response, Federal wrote, "Without waiver of our previously stated position on coverage, Federal Ins. Co. does not object to the proposed settlement agreement between Osmond and SAG." (Federal's Disputes ¶ 18; Brower. Decl. ¶ 7, Ex. E.)

On or about September 10, 2010, SAG entered into the Settlement Agreement relating to the Osmond Action. (Federal's Disputes ¶ 19.) The Settlement Agreement required SAG to use reasonable efforts to allocate and pay 90% of the foreign levy funds to the proper recipients within three years and, if SAG failed to do so, that SAG

notify class counsel. (Brower Decl. ¶ 8, Ex. F (the "Settlement Agreement") § V.E.1.) The Settlement Agreement further provided that the cost of administering SAG's foreign levies program "shall be paid from interest earned on collected Foreign Levy Funds and from an administrative fee charged by SAG to Performers who receive payments of Foreign Levy Funds." (*Id.* § V.F.1.) The administrative fee was approved in an amount up to 10% of the Foreign Levy Funds collected. (*Id.*)

On March 2, 2011, the Los Angeles Superior Court, Honorable Carl J. West presiding, entered a Judgment and Order Granting · Final Approval of Class Action Settlement (the "Osmond Judgment"). (Brower Decl. ¶ 8, Ex. F ("Osmond Judgment") at 3.) By that Judgment, the court ordered the parties "to comply with and carry out the provisions of the Settlement Agreement in accordance with its terms" (*id.*) and provided that "[n]either the Settlement Agreement nor anything contained therein, nor any act or thing done in connection therewith, [was] intended to be nor shall be construed or deemed to be an admission by any party to the Settlement Agreement of any liability, fault or wrongdoing, or an admission by any such party of any fact, allegation or claim whatsoever" (*id.* at 4). The court awarded Osmond an enhancement payment in the amount of $15,000 and class counsel fees and costs in the amount of $315,000, for a total amount of $330,000 (the "$330,000 Award"). (*Id.* at 4–5.)

By a letter dated March 31, 2011, SAG tendered the Osmond Judgment to Federal requesting reimbursement of the $330,000 Award. (Brower Decl. ¶ 9, Ex. G [Doc. # 18–11].) In response, on June 20, 2011, Federal sent a letter to SAG advising that, pursuant to section 5(j), SAG's claim was not covered by the Policy. (Decl. of Thomas Allison–Couto ("Allison–Couto

Decl.") [Doc. # 14–4] ¶ 11, Ex. 16 [Doc. # 16] at 2.)

## III.

### *LEGAL STANDARDS*

■■■ Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir.2011). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Partial summary judgment may be sought on any claim or defense, or part thereof, and the court may grant less than all of the relief requested by the motion. *See* Fed. R.Civ.P. 56(a, g).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c, e) (1986)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir.2010) (*en banc* ) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■■■ A court presented with cross-motions for summary judgment should review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences from the record. *Center for Bio–Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir.2008), *cert. denied*, 555 U.S. 1098, 129 S.Ct. 903, 173 L.Ed.2d 108 (2009).

## IV.

### *CROSS–MOTIONS FOR SUMMARY JUDGMENT*

#### A. *Principles of Insurance Policy Interpretation*

■■■ Under California law, interpretation of an insurance policy is a question of law that is decided under settled rules of contract interpretation. *State v. Continental Ins. Co.*, 55 Cal.4th 186, 195, 145 Cal.Rptr.3d 1, 281 P.3d 1000 (2012). "The mutual intention of the parties at the time the contract is formed governs interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 647, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003) (citing Cal. Civ.Code § 1636). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *Id.* (citing Cal. Civ.Code § 1639). Contract provisions are interpreted in their "ordinary and popular sense ... unless used by the parties in a technical sense, or unless a special meaning is given to them by usage." Cal. Civ. Code § 1644. If contractual language is clear and explicit, it governs. *Id.* § 1638. "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *State*, 55 Cal.4th at 195, 145 Cal. Rptr.3d 1, 281 P.3d 1000.

 If the policy language is unclear or ambiguous, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it. Cal. Civ.Code § 1649. "[A]mbiguities are generally construed against the party who caused the uncertainty to exist (*i.e.,* the insurer) in order to protect the insured's reasonable expectation of coverage." *State,* 55 Cal.4th at 195, 145 Cal.Rptr.3d 1, 281 P.3d 1000.

 Finally, coverage may be limited by exclusionary clauses only to the extent that those clauses are "conspicuous, plain and clear." *Haynes v. Farmers Ins. Exch.,* 32 Cal.4th 1198, 1204, 13 Cal. Rptr.3d 68, 89 P.3d 381 (2004). "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] . . . exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon,* 31 Cal.4th at 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (internal quotations omitted). Thus, the insured bears the burden of establishing that the claim is within the basic scope of coverage, while the insurer bears the burden of establishing that the claim is specifically excluded. *Id.* (citing *Aydin Corp. v. First State Ins. Co.,* 18 Cal.4th 1183, 1188, 77 Cal.Rptr.2d 537, 959 P.2d 1213 (1998)).

 In California, the elements of a breach of contract claim are (1) the existence of a valid contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach of the contract, and (4) resulting damages to the plaintiff. *Oasis West Realty, LLC v. Goldman,* 51 Cal.4th 811, 821, 124 Cal.Rptr.3d 256, 250 P.3d 1115 (2011).

### B. *Discussion*

SAG seeks summary judgment on its first cause of action for breach of contract and second cause of action for breach of the implied covenant of good faith and fair dealing. Conversely, Federal seeks to establish that it owes no duty to indemnify SAG for the $330,000 award, that its decision to deny indemnity was reasonable and correct, and that it owes SAG nothing more for defense fees/costs associated with the Osmond Action.

Federal argues, *inter alia,* that SAG's claims fail in light of the recent ruling in *Health Net, Inc. v. RLI Ins. Co.,* 206 Cal. App.4th 232, 141 Cal.Rptr.3d 649 (2012), for three key reasons: (1) that SAG's own arguments establish that the $330,000 Award does not arise from a "covered" Claim under the Policy; (2) that "coverage cannot be bootstrapped based solely on a claim for attorney's fees"; and (3) there is no coverage for a claim seeking unpaid benefits the insured had contractually agreed to pay.[1] (Federal's Supp. Brief at 3.) In particular, Federal points to the court's ruling in *Health Net* that the damages sought by the respective classes amounted to unpaid benefits under the plaintiffs' health plans and, as a result, were not covered by the insurance policy at issue in that case. *Id.* at 252, 141 Cal.Rptr.3d 649. Federal argues that, insofar as the indemnity that SAG seeks in the instant action is analogous to the damages sought in *Health Net,* it similarly falls outside of a covered Claim under the Policy.

In *Health Net,* class members sued their health insurers for unpaid benefits under their health plans. 206 Cal.App.4th at 252, 141 Cal.Rptr.3d 649. The health insurers' policy in that case covered "Damages . . .

---

1. In light of the Court's ruling *infra,* the Court need not reach the other grounds for Federal's opposition to SAG's Motion.

resulting from any Claim or Claims ... for any Wrongful Act of the Insured." *Id.* "Wrongful Act," in turn, was defined as "any actual or alleged breach of duty, breach of confidentiality, neglect, error, misstatement, misleading statement or omission, ...." *Id.* The *Health Net* court concluded that there was no coverage for payments arising out of the unpaid benefits because the health insurers were "obligated to pay their insureds *by contract,* independent of any Wrongful Act," as opposed to amounts due to the insureds as a result of a "wrongful act" as defined in the policy. *Id.* at 252–53, 141 Cal.Rptr.3d 649 (italics in original). The court held: "In short, [p]erformance of a contractual obligation ... is a debt the [insured] voluntarily accepted. It is not a loss resulting from a wrongful act within the meaning of the policy." *Id.* at 253, 141 Cal.Rptr.3d 649 (internal quotations omitted).

 California courts have also held, "[e ]ven in the absence of an express exclusion, ... a claim alleging breach of contract is not covered under a professional liability policy because there is no 'wrongful act' and no 'loss' since the insured is simply being required to pay an amount it agreed to pay." *Id.* (citing *August Entm't, Inc. v. Philadelphia Indemnity Ins. Co.,* 146 Cal.App.4th 565, 579, 52 Cal.Rptr.3d 908 (2007) (emphasis in original)). This policy makes sense when considered in practical terms: if a contracting party fails to pay amounts due under a lawful contract and is sued for that failure to pay, it cannot then obtain a windfall by having its payments covered by an insurance policy covering only "wrongful acts."

In this case, neither party presents the Court with a copy of a pre-settlement written agreement obligating SAG to distribute the foreign levy funds to the Osmond Action class plaintiffs. Nevertheless, in its opposition to Federal's motion, SAG explains that, as the largest actors' union, it initiated negotiations with the studios as part of a collective bargaining process and, "in an historic agreement, effective in 1992 began to collect/receive a portion (50%) of the Foreign Video Levy on behalf of all U.S. actors." (SAG's Opp'n at 3–4.) SAG also explains, however, that accounting for and distributing the money to the performers was difficult, particularly without an automated system. (*Id.* at 5.) Thus, according to SAG, "[t]he only reason SAG didn't distribute funds to performers before September 2007 was because there was no computer system in place for doing it" and "SAG actually distributed over $8,400,000 in Foreign Royalties to Performers *before* the settlement in the Osmond matter." (*Id.*)

Indeed, when presenting its request for reimbursement to Federal in a letter dated March 31, 2011, SAG based its coverage position on its belief that the foreign levy funds were "already due and owing to the members in the course of the normal handling of [such funds]" (SAG's Disputes ¶ 87; Allison–Couto Decl. ¶ 9, Ex. 15). SAG also emphasizes that, "[u]nder the settlement, SAG will *continue* to distribute funds to performers on whose behalf it collects foreign royalties" (SAG's Opp'n at 5; referring to the Notice of Court–Approved Class Action Settlement) (emphasis in original), and that the Judgment confirmed that SAG "could *continue* to collect the administrative fees and the interest." (SAG's Opp'n at 6).

 SAG attempts to distinguish *Health Net* by highlighting differences in the factual circumstances and the policy language. In particular, SAG argues that, unlike the policy issued to Health Net, coverage under the Policy is not limited to "damages." Instead, SAG argues, the Policy "covered any sum that SAG was legally obligated to pay as a result of a wrongful act, and the definition of wrongful act, in

turn, was incredibly broad." (SAG's Supp. Brief at 5.) SAG's argument is not persuasive. Although "Loss" under the Policy is not limited to damages, the Policy only covers claims "made against the Organization ... for a Wrongful Act committed, attempted, or allegedly committed or attempted by the Organization or the Insured Persons...." (Federal's Disputes ¶¶ 4–5.) The Policy's definition of "wrongful act" is not materially different from that of the *Health Net* policy. *See* 206 Cal.App.4th at 252, 141 Cal.Rptr.3d 649. Moreover, that the Policy contains a "Loss" definition that is broader than the *Health Net* policy is irrelevant to the determination whether the claims in this case *arise out of* a "Wrongful Act." *See Health Net*, 206 Cal.App.4th at 252–54, 141 Cal. Rptr.3d 649. It is for that reason that the court in *Health Net* rejected the insured's argument that the claim for attorney's fees constituted a claim for damages. The court held that "if the entire action alleges no covered wrongful act under the policy, coverage cannot be bootstrapped based solely on a claim for attorney's fees." *Id.* at 257, 141 Cal.Rptr.3d 649.

In this case, SAG's own coverage position and assertions lead to but one result, which is that, insofar as SAG is and was, prior to the Osmond Action, obligated to account for and distribute the foreign levy funds to the plaintiff class, SAG fails to establish that the $330,000 Award arises from a "covered" Claim under the Policy. As such, the Court finds that SAG's first cause of action for breach of contract fails as a matter of law and Federal owes no duty to indemnify SAG for the $330,000 award. The Court therefore denies SAG's Motion and grants Federal's Motion as to SAG's first cause of action.

In addition, "without coverage there can be no liability for bad faith on the part of the insurer." *Kransco ·v. American Empire Surplus Lines Ins. Co.,*

23 Cal.4th 390, 408, 97 Cal.Rptr.2d 151, 2 P.3d 1 (2000). Thus, to the extent SAG fails to establish Federal's liability for breach of contract, SAG's second cause of action for breach of the implied covenant of good faith and fair dealing also fails. The Court denies SAG's Motion and grants Federal's Motion as to SAG's second cause of action.

In the alternative, SAG asks that the Court grant partial summary judgment on the following contract issues: (1) that Federal owed a duty to indemnify SAG for the entire $330,000 "Loss" that SAG paid pursuant to the settlement and judgment in the Osmond Action; (2) that Federal owed a duty to defend SAG, which encompasses the $315,000 that SAG paid as attorney's fees pursuant to the settlement and judgment; and (3) that Federal's fourteenth affirmative defense based upon exclusion 5(j) is without merit; and (4) that Federal's thirteenth and fifteenth affirmative defenses based upon alleged failure to satisfy other terms, conditions and exclusion are without merit. In light of the Court's finding that no coverage exists under the Policy, it need not reach SAG's alternative arguments.

## V.

### MOTION TO SUBSTITUTE PARTY PLAINTIFF

As noted above, SAG filed a motion to substitute party plaintiff on June 13, 2013, seeking to substitute the Screen Actors Guild—American Federation of Radio and Television Artists ("SAG–AFTRA"), a Delaware corporation, as party plaintiff. The motion is based on SAG's recent merger with AFTRA, another labor union. (*See* Decl. of Duncan Crabtree–Ireland ¶ 3 [Doc. # 34].)

Federal states that it does not oppose the motion on the following conditions: (1)

that any substitution of plaintiffs does not affect the parties' claims or defenses in this action; and (2) the substitution of plaintiffs in this action does not modify the terms of the insurance policy at issue or affect any other claims thereunder. (Opp'n at 1.) Both parties acknowledge and agree to these conditions.

Having considered the arguments put forward in SAG's motion, the Court finds that substitution of SAG–AFTRA as Plaintiff in this action is appropriate under Fed. R.Civ.P. 25(c).

## VI.

### *CONCLUSION*

In light of the foregoing,

(1) SAG's motion to substitute SAG–AFTRA as party plaintiff is **GRANTED.** From this time forward, Screen Actors Guild—American Federation of Television and Radio Artists shall be the Plaintiff in this matter. This substitution shall not affect the parties' claims or defenses in this action or modify the terms of the insurance policy at issue or any other claims thereunder;

(2) SAG–AFTRA's motion for summary judgment is **DENIED;**

(3) Federal's motion for summary judgment is **GRANTED;**

(4) The July 12, 2013 hearing is **VACATED.**

**IT IS SO ORDERED.**