[No. B224884. Second Dist., Div. Three. May 22, 2012.]

HEALTH NET, INC., Plaintiff and Appellant, v.
RLI INSURANCE COMPANY et al., Defendants and Respondents.

[No. B240833. Second Dist., Div. Three. May 22, 2012.]

HEALTH NET, INC., Plaintiff and Appellant, v.
AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE
COMPANY et al., Defendants and Respondents.

236

## COUNSEL

Covington & Burling, David B. Goodwin, Michael S. Greenberg, Jeffrey M. Davidson; Pillsbury Winthrop Shaw Pittman and Reynold L. Siemens for Plaintiff and Appellant.

Sedgwick, Detert, Moran & Arnold, Michael R. Davisson, Susan Koehler Sullivan and Michael M. Walsh for Defendant and Respondent RLI Insurance Company.

P.K. Schrieffer, Paul K. Schrieffer, Rena M. Stone and Stephen C. Bass for Defendant and Respondent Certain Underwriters at Lloyd's London.

Waxler ♦ Carner ♦ Brodsky, Andrew J. Waxler and Gretchen S. Carner for Defendant and Respondent American International Specialty Lines Insurance Company.

Troutman Sanders, Wallace A. Christensen, Robert M. Pozin, Jennifer Mathis, Melissa J. Perez and Jacqueline S. Treu for Defendant and Respondent Executive Risk Specialty Insurance Company.

## OPINION

**CROSKEY, Acting P. J.**—In this insurance coverage dispute, Health Net, Inc. (HN-INC), brought suit against four of its insurers (one primary and three excess carriers) seeking a declaratory judgment that the insurers had a duty to defend and indemnify it in over 20 underlying actions. The parties, however, directed their attention to *two* specific underlying actions, as the amount of indemnity sought in those actions would far exceed the combined policy limits of the defendant insurers. Relying on a policy exclusion for dishonest acts, the trial court granted summary adjudication to the insurers with respect to HN-INC's claim for reimbursement of its defense costs and the costs of settling the specified underlying actions. The parties subsequently

settled their dispute regarding the remaining underlying actions, and summary judgment was granted in favor of the carriers. HN-INC appeals.[1]

On appeal, we first address whether the two underlying actions at issue sought damages covered by HN-INC's insurance policies; we conclude that the great bulk of the claims asserted in the underlying actions were not covered, but there was a potential for coverage for some of them. Second, we turn to the dishonest acts exclusion, and consider whether it bars, as a matter of law, coverage for all of the otherwise covered claims in the underlying actions; we conclude that, while it appears that the dishonest acts exclusion was triggered with respect to the underlying actions, the exclusion bars coverage only for those claims alleging dishonest acts, not the entirety of the underlying actions.[2] As *some* claims for indemnity and defense costs relating to the two underlying actions at issue remain, we reverse the summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The resolution of this appeal requires consideration of the allegations of the underlying actions at issue, and the specific relationship between certain claimed dishonest acts and the allegations in those actions. We begin with a detailed discussion of the underlying facts and procedure.

### 1. *Entities and Alleged Practices*

We are concerned with HN-INC and various of its subsidiaries, particularly Health Net of the Northeast, Inc. (HN-NE), and Health Net of New Jersey, Inc. (HN-NJ). At times, the record refers to all Health Net entities collectively; when we do so, we will use the abbreviation "HN."

HN is a health insurer.[3] It insures individuals through health plans provided by their employers. As all of HN's insurance plans at issue are provided by employers, the plans are subject to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA; 29 U.S.C. § 1001 et seq.). There is a relevant distinction between HN plans provided for small employers (fewer than 50 employees), and those provided by large employers (50 or

---

[1] As we discuss below, there are actually two summary judgments at issue in these consolidated appeals, as two carriers obtained summary judgment before the remaining two carriers did.

[2] In making this determination, we necessarily conclude that the word "Claim" in the policy refers to a claim for relief in an underlying lawsuit, rather than the entire lawsuit.

[3] According to HN-INC's reply brief in this appeal, HN-INC itself does not insure anyone or administer health plans; all of that work is conducted by its subsidiaries. There is, however, no citation to the voluminous record supporting this proposition; nor did our review of the record reveal any evidence on the issue.

more employees). This is because there is a New Jersey regulation which specifically applies to small employer health plans in New Jersey. (N.J. Admin. Code § 11:21-7.13 (NJ regulation).) We will refer to plans subject to such NJ regulation as "small NJ plans."

As we will discuss, the underlying actions involve various allegations against HN-INC and its subsidiaries. In order to simplify the discussion, we will identify the different types of allegations made against HN, before identifying which allegations were made in each action.

### a. Allegations Relating to Adjustment of Out-of-network Claims

Under HN's plans, subscribers and beneficiaries can obtain medical services from health care practitioners within HN's preferred network and from those outside of the network (ONET). The underlying cases are concerned with HN's practices of calculating the amount it will reimburse its subscribers and beneficiaries for ONET medical services. There are, broadly speaking, three categories of alleged wrongdoing with respect to the calculation of ONET reimbursement which are at issue in the underlying actions.

#### (1) Allegations That the Ingenix Databases Are Systematically Flawed

While each HN plan uses somewhat different language, the plans, in general, provide for reimbursement for ONET services at some established percentage of the usual, customary and reasonable charge (UCR) for those services. In determining the UCR for any particular medical procedure, HN uses one or more databases provided by a company called Ingenix. Ingenix is itself owned by another health insurer, and it has been alleged that the Ingenix databases are inherently flawed and impermissibly skewed in favor of lower UCR's.[4] For example, it has been alleged that the Ingenix data compilation practices (1) only include data submitted by insurance companies; (2) exclude higher charges as outliers; (3) fail to take into account the education and experience of the practitioners providing the services; and (4) calculate geographic area by the first three digits of a ZIP Code, rather than properly considering the community in which the service is provided. We refer to such allegations collectively as allegations that the Ingenix databases are systematically flawed.

---

[4] Indeed, in January 2009, UnitedHealth Group Incorporated, the health insurer parent of Ingenix, entered into an agreement with the New York Attorney General's Office, in which it agreed to stop using the Ingenix databases and to contribute $50 million to a nonprofit organization for the purpose of creating and operating a new, independent database. (*UnitedHealth Group Inc. v. Hiscox Dedicated Corporate Member Ltd.* (D.Minn., Feb. 9, 2010, No. 09-CV-0210 (PJS/SRN)) 2010 WL 550991, pp. *2, *21.)

### (2) *Allegations That HN Uses Outdated Databases*

Ingenix updates its databases every six months. At some point, two or more HN entities, including HN-NE and HN-NJ, chose to not use the updated Ingenix databases in their calculation of UCR. Indeed, HN-NE and HN-NJ continued to use a 1998 Ingenix database well into 2000. Thereafter, they briefly used an updated database, only to "rollback" their ONET reimbursement rates to those supported by the 1998 database in the summer of 2001.[5] This violated New Jersey law, at least with respect to small NJ plans, as the NJ regulation *mandated* that small NJ plans use the current Ingenix database. We refer to allegations that HN entities used the 1998 database beyond 1998 as allegations related to the use of an outdated database.

### (3) *Allegations of Non-Ingenix Adjustment Misconduct*

There is a third set of allegations of alleged adjustment misconduct at issue in this case. It is alleged that HN's reimbursement practices for ONET claims were improper in ways unrelated to the use of the Ingenix databases. For example, it is alleged that HN improperly reduced reimbursement for a second procedure carried out on the same day as an initial procedure, even if the two were unrelated. It is also alleged that HN improperly reduced reimbursement for assistant surgeons, and underreimbursed for mental health services and emergency room services. We refer to such allegations collectively as allegations of non-Ingenix adjustment misconduct.

### b. *Allegations Relating to ERISA Obligations*

ERISA imposes several obligations on employee benefit plans. There are three types of ERISA obligations at issue in the underlying actions.

### (1) *Obligation to Provide a Full and Fair Review*

ERISA mandates that every plan shall provide adequate written notice to any participant or beneficiary whose claim for benefits has been denied, setting forth the specific reasons for the denial. (29 U.S.C. § 1133(1).) The plan shall also afford a reasonable opportunity for "a full and fair review" to any participant whose claim for benefits has been denied. (29 U.S.C. § 1133(2).) We refer to these obligations collectively as the obligation to provide a full and fair review.

### (2) *Obligation to Make Disclosures*

ERISA requires that a "summary plan description" of an employee benefit plan be furnished to participants and beneficiaries; the summary plan description is required, by statute, to include certain specific information regarding

---

[5] This intentional decision was a cost-cutting measure.

the participants' rights and obligations under the plan. (29 U.S.C. § 1022.) We refer to this and similar obligations collectively as the obligation to make disclosures.

### (3) Fiduciary Duties

ERISA requires every employee benefit plan to designate one or more named fiduciaries to control and manage the plan. (29 U.S.C. § 1102(a)(1).) The fiduciaries are required to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." (29 U.S.C. § 1104(a)(1)(B).) ERISA also indicates that a fiduciary shall discharge its duties with respect to the plan solely in the interest of the participants and beneficiaries and "in accordance with the documents and instruments governing the plan . . . ."[6] (29 U.S.C. § 1104(a)(1)(D).) We discuss these obligations collectively as fiduciary duties.

### 2. The Underlying Proceedings

The two underlying actions, coverage for which is at issue in this case, are referred to as the *Wachtel* action and the *McCoy* action. Simultaneously with the proceedings in these actions, and quite relevant to them, was an investigation by the New Jersey Department of Banking and Insurance (NJ-DOBI) into HN-NJ's use of outdated data, which resulted in two consent orders. Although it did not occur first in time, we begin our discussion of the underlying proceedings with the NJ-DOBI investigation.

### a. The NJ-DOBI Investigation

In 2002, the NJ-DOBI first learned of HN-NJ's use of an outdated database.[7] When the NJ-DOBI confronted HN-NJ with the NJ regulation, HN-NJ ceased using the out-of-date database and promised to reprocess all affected claims. HN-NJ informed the NJ-DOBI that it had used the outdated database from July 1, 2001 (i.e., when it chose to do the "rollback"), and therefore reprocessed only claims based on services rendered after that date. It did not disclose to the NJ-DOBI that it had used an outdated database in 1999 and 2000, as well. HN-NJ entered into a consent order with the

---

[6] This subsection appears to transform a breach of the plan documents into a breach of fiduciary duty.

[7] In May 2002, a small NJ plan member brought a complaint to the NJ-DOBI, stating that HN-NJ reimbursed him only $77 for an ONET service for which his prior health insurer had reimbursed $125. When the NJ-DOBI asked HN-NJ for a response, HN-NJ responded that it had determined the UCR from the 1998 Ingenix database.

NJ-DOBI agreeing to make the necessary repayments relating to claims from July 2001 onward, and to pay a $60,000 fine.

As the *Wachtel* and *McCoy* actions proceeded in the United States District Court for the District of New Jersey, HN engaged in certain discovery abuses apparently calculated to avoid revealing that the NJ-DOBI consent order rested upon misinformation regarding the scope of HN's wrongdoing. HN would be sanctioned for these discovery abuses.

In 2005, the NJ-DOBI finally learned of the full scope of HN-NJ's use of outdated data. This led to an examination of HN-NJ, in which NJ-DOBI investigators discovered problems relating to the use of outdated databases dating back to 1995. Investigators discovered $14.4 million in underpayments; full restitution would require an additional payment of $11.6 million in interest. In a consent order dated August 26, 2008, HN-NJ agreed to make full restitution—both to small NJ plan participants and large NJ plan participants. HN-NJ also agreed to pay a $13 million fine, in connection with all of its violations.

b. *The* Wachtel *Action*

On July 23, 2001, Zev and Linda Wachtel, individually and on behalf of their minor son, Tory, brought an action in New Jersey state court, against certain HN predecessor entities. The Wachtels alleged that their son had incurred over $42,000 in necessary ONET medical bills, but they were reimbursed only $14,000. The *Wachtel* action went through several amended complaints, and was ultimately certified as a class action in federal court.

Relevant to our purposes is that, although the Wachtels believed that they had been underreimbursed, the reasons they alleged for the underreimbursement changed through time. In their first amended complaint, the Wachtels pleaded that the Ingenix database was systematically flawed. Subsequently, they learned that, had their claim been adjusted pursuant to the applicable Ingenix database (as required by the NJ regulation), they would have been entitled to complete reimbursement. In the apparent belief that HN had simply failed to use the Ingenix database at all, the Wachtels generally pleaded violation of the NJ regulation. They did not include allegations that the Ingenix database was systematically flawed.

The operative complaint in *Wachtel* was filed on October 13, 2003. It specifically named HN-INC, HN-NE, and HN-NJ as defendants. In this complaint, for the first time, the Wachtels specifically alleged that HN had violated the NJ regulation by using outdated databases. The Wachtels also alleged non-Ingenix adjustment misconduct, which allegedly had violated

other NJ regulations. They also pursued of a cause of action under ERISA—for failing to make required disclosures, failing to provide a full and fair review, and breach of fiduciary duties.

### c. *The* McCoy *Action*

At the point in the *Wachtel* action when the Wachtels eliminated from their complaint any allegation that the Ingenix databases were systematically flawed, a new class action was filed against HN-INC, by Renee McCoy,[8] filling the gap and alleging the Ingenix databases were systemically flawed.

On August 5, 2004, the federal court consolidated *Wachtel* and *McCoy* for trial.[9] The operative complaint was then filed in *McCoy*, naming additional representative plaintiffs, and additional HN-related defendants. The class was described as all members and subscribers nationwide who were *not* in small NJ plans (those individuals were already members of the *Wachtel* class). Allegations of wrongdoing encompassed all three types of adjustment-related misconduct discussed above. There were 18 specific allegations that the Ingenix databases were systematically flawed; allegations that HN used outdated databases; and allegations of non-Ingenix adjustment misconduct—some of which was alleged to violate state laws and regulations, and other conduct which was simply alleged to be improper. Moreover, McCoy pursued all three types of ERISA violations—disclosure violations, failure to provide a full and fair review, and breaches of fiduciary duties.

### d. *The Federal Court's Sanctions Order in the Consolidated Actions*

As discovery in *Wachtel* and *McCoy* proceeded, it ultimately became clear to the federal court that HN[10] was being less than candid in its discovery responses. This resulted in an integrity hearing and, on December 6, 2006, a blistering opinion sanctioning HN for its conduct.[11] According to the court,

---

[8] McCoy was represented by the same counsel as the Wachtels.

[9] The court also certified classes in each action, although that order would subsequently be reversed on appeal. (*Wachtel v. Guardian Life Ins. Co.* (D.N.J. 2004) 223 F.R.D. 196, vacated and cause remanded (3d Cir. 2006) 453 F.3d 179.)

[10] The HN entities were jointly represented in the consolidated *Wachtel* and *McCoy* matters. In the trial court's opinion imposing discovery sanctions, the trial court referred to all HN entities collectively. (*Wachtel v. Health Net, Inc.* (2006) 239 F.R.D. 81, 82, fn. 1.)

[11] We quote from the opinion: "Defendants' strategy has been a concerted war to waste huge time and resources of Plaintiffs in pursuing this litigation. It gives 'scorched earth litigation' a new standard of brashness. Defendants have also forced the Court to devote years to police discovery abuses over and over again. Defendants continue to ignore the Court's rulings over and over again. Defendants' persistent pattern of delay, defiance of Court Orders, evasive responses to Plaintiffs' discovery requests, and lack of candor have resulted in crushing

"Despite extensive top-level corporate knowledge of the use of outdated data prior to July 2001, [HN] did not disclose to NJ-DOBI any liability from 1999 through June 2001, cutting in half its period of liability. This decision led to the discovery abuses in the instant litigation, which appear calculated to avoid revealing that [HN]'s 2002 Consent Order with NJ-DOBI rested upon misinformation." (*Wachtel v. Health Net, Inc., supra,* 239 F.R.D. at p. 87.) The court found that "[d]espite numerous specific Court Orders, Health Net never produced thousands and thousands of pages of relevant and responsive documents within the three-year-long discovery period. Many of these documents are highly relevant to the knowledge of key personnel at [HN] about the company's use of the outdated data described above." (*Id.* at p. 91.)

As a result of HN's pervasive discovery abuses, the federal court imposed the sanction of deeming certain facts established against HN. The court summarized those deemed facts as follows: "[T]his Court will deem established for the purposes of this litigation the facts found in this Opinion regarding [HN]'s knowing and willful use of outdated data; [HN] and its officials' actions to hide the full scope of its conduct from NJ-DOBI; [and] [HN]'s false claims of 'recent discovery' of the 1999-July 2001 malfeasance to avoid injunctive relief . . . . These facts will be deemed admitted for all purposes, including equitable relief." (*Wachtel v. Health Net, Inc., supra,* 239 F.R.D. at p. 104.)

As it will be critical to our analysis, we note that HN's discovery misconduct, and the facts deemed established as a result thereof, related exclusively to HN's use of outdated data. Nothing was deemed established regarding systematic flaws in the Ingenix databases, any non-Ingenix adjustment misconduct, the failure to provide required documents, the failure to provide a full and fair review, or breaches of HN's fiduciary duties. However, it was *deemed established* that HN had knowingly and willfully used outdated data.

---

prejudice to Plaintiffs in the form of forgetful witnesses and extraordinary expenditures of time, effort, and money. The wanton waste of judicial resources caused by [HN], as exemplified herein, is equally staggering." (*Wachtel v. Health Net, Inc., supra,* 239 F.R.D. at p. 99.) HN-INC incurred approximately $36 million in defense costs in *Wachtel* and *McCoy* prior to this hearing. Certainly, those defense costs attributable to "years . . . of discovery abuses" were not "reasonable and necessary fees," for which HN-INC can legitimately seek compensation from its insurers.

### e. *HN settles the* Wachtel *and* McCoy *Actions*

On March 13, 2008, HN settled the *Wachtel* and *McCoy* actions with a global settlement agreement that also encompassed a third action.[12] Pursuant to the settlement agreement,[13] HN-INC agreed to pay a total of $215 million to settle the actions against itself and each of its subsidiaries.[14] The $215 million was allocated as follows: $15 million toward restitution to NJ policyholders, in partial satisfaction of the NJ-DOBI consent orders; $40 million to class members who submit claims for underpayment of ONET benefits; and an additional $160 million to resolve the remaining class claims (to be allocated pursuant to a plan). It was agreed that class counsel could apply to the court for attorney fees and expenses, which would be paid exclusively out of the settlement fund. HN also agreed to change its business practices for the next four years, during which time it would cease using the Ingenix databases, unless their use was required or approved by state law. HN also agreed to change the information it provided its participants, and to create a new appeals process to enable participants to challenge the denial or underpayment of ONET claims.

---

[12] In the instant action, HN-INC did not seek defense and indemnification from its insurers with respect to the third class action addressed by the settlement agreement. As such, it cannot recover in this action any of the settlement amounts attributable to that action.

[13] The terms of the settlement agreement provide that it is not admissible in evidence in any action except an action to enforce it. Neither party objected, however, to the use of the settlement agreement in the instant action.

[14] HN-INC is the only plaintiff in the instant case. Although HN-INC's subsidiaries are also considered insureds under the relevant policies, HN-INC is the only HN entity which paid money under the settlement agreement (and, allegedly, paid the defense costs), so it is the only HN entity seeking to recover under its insurance policies. This enables HN-INC to argue that, although its subsidiaries, particularly HN-NJ and HN-NE, may have willfully violated the NJ regulation, HN-INC was innocent of any wrongdoing, and therefore *its* right to recover from its insurers should not be tarnished by the intentional acts of its subsidiaries. We note the rather obvious proposition that, had this matter gone to trial, it is quite likely that the majority of damages would have been awarded against HN-INC's culpable subsidiaries, not HN-INC itself (indeed, HN-INC notes that, when the federal court approved the settlement agreement, it stated that there were "genuine issues as to the liability of the parent company, [HN-INC]"). Thus the HN entities should not be permitted to collectively avoid the adverse effects on coverage resulting from the subsidiaries' willful misconduct simply by shifting all of the damages to the parent corporation. We note, for example, that the settlement agreement provides that $15 million of the $215 million payment made by HN-INC was to be allocated to payments HN would be required to make as a result of the then reopened NJ-DOBI investigation. Yet, HN-NJ was the only HN entity that was subject to the NJ-DOBI investigation, and, therefore, HN-NJ was the only HN entity ultimately required to pay that $15 million. That HN-INC *voluntarily* paid this amount on behalf of its subsidiary does not mean that the money was not paid for *willful misconduct*. Admittedly, HN-INC concedes that it is not entitled to reimbursement for the $15 million paid in connection with the NJ-DOBI investigation, but fails to recognize that a significant amount of the remaining funds it paid to settle the *Wachtel* and *McCoy* actions was similarly paid as the result of willful misconduct of its subsidiaries, and not merely for its own vicarious liability.

On August 8, 2008, the federal court issued its opinion approving the settlement agreement. Two points are significant about the court's order. First, the court stated, "The Ingenix database suffers from numerous errors that must be addressed if a settlement is to be deemed 'fair, reasonable, and adequate' . . . ." The court believed these issues were adequately addressed in the settlement. Second, the court awarded class counsel $69.72 million in attorney fees, out of the class settlement.[15]

### 3. *The Instant Coverage Action*

Prior to the settlement of the *Wachtel* and *McCoy* matters, HN-INC brought the instant action against four of its insurers: (1) American International Specialty Lines Insurance Company (AISLIC), its primary carrier, which had issued a policy with $25 million in coverage inclusive of defense costs; (2) Executive Risk Specialty Insurance Company (ERSIC), its first-level excess carrier, which had issued a policy with $25 million in coverage, conforming in terms to the AISLIC policy; (3) RLI Insurance Company (RLI), its second-level excess carrier, which had issued a policy with $25 million in coverage, also conforming in terms to the AISLIC policy; and (4) Certain Underwriters at Lloyd's, London (Lloyd's), who subscribed to a third-level excess policy with $25 million in coverage; this policy also was conforming in terms to the AISLIC policy.[16]

Several provisions in the AISLIC policy are relevant to our disposition of the case. We will set forth those provisions at length as necessary. At this point, however, we note that the following four provisions are of particular relevance to our discussion: (1) An insuring clause, providing coverage for "Damages for Claims" made and reported during the policy period for "Wrongful Acts"; (2) the definition of "Claims" to include lawsuits, written notices of claims, or written notices of facts which may reasonably be expected to give rise to claims; (3) a standard provision for the insurer to pay defense costs, which is superseded by a "Choice of Counsel Endorsement" which permits the insured to hire its own counsel and be reimbursed by the insurer; and (4) an exclusion from coverage for any Claim arising out of dishonest acts.

---

[15] In HN-INC's reply brief, it erroneously states that it was required to pay $70 million for class counsel's fees *in addition to* the $200 million it had to pay the classes to settle the actions. The record reflects that this is not true; the attorney fees were taken out of the settlement, as provided in the settlement agreement.

[16] HN-INC appears to have some other excess policies, providing lesser amounts of coverage. They are not at issue in this action. Additionally, it is understood that HN-INC has already used some $4 million in its aggregate coverage under the AISLIC policy. However, for the sake of simplicity and clarity, we, as did the parties, assume that the full $25 million in coverage is available under each policy.

On August 23, 2006, HN-INC brought suit against all four of its insurers, for failure to defend (or reimburse) and indemnify it in 21 underlying actions, including *Wachtel* and *McCoy*. It alleged a cause of action for breach of contract against AISLIC alone and causes of action for declaratory relief regarding the duties to defend and indemnify against all four insurers.

a. *HN-INC's Summary Adjudication Motion on Duty to Pay Defense Costs*

On August 8, 2007, after the discovery sanctions order in *Wachtel*, but prior to the settlement agreement, HN-INC moved for summary adjudication against its primary (AISLIC) and first-level excess (ERSIC) carriers only, on the issue of their duty to pay defense costs in *Wachtel*, *McCoy* and a third case not at issue in this appeal.[17]

On May 18, 2009, after substantial briefing and argument, the trial court denied the summary adjudication motion.[18] The court acknowledged that, typically, insurance policies provide that the insurer must provide a defense *only* for claims which are potentially covered by the policy; the law, however, imposes a duty to defend the entire action. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 47–48 [65 Cal.Rptr.2d 366, 939 P.2d 766].) As the duty to defend claims in such an action that are not even potentially covered is imposed by law, not contract, the law permits the insurer (which has properly reserved the right to do so) to seek reimbursement for costs expended defending those not-potentially-covered claims. (*Id.* at p. 50.) However, the trial court concluded that the instant case was different. Relying on policy language defining "Claim" to include "any judicial . . . proceeding," and the Choice of Counsel Endorsement, requiring the insurer to reimburse all reasonable and customary defense costs incurred "in defense of any Claim or Law Suit brought against the Insured alleging a Wrongful Act," the trial court concluded that the policy itself *expressly* required the insurer to pay defense costs incurred in the defense of the *entire underlying lawsuit*, as long as it included a single allegation of a potentially covered wrongful act.

The trial court then turned to the insurers' argument that there was no coverage for any of the allegations in *Wachtel* and *McCoy*, based on the dishonest act exclusion. The dishonest act exclusion provides, in full: "This policy does not apply to any Claim: (a) arising out of or alleging any criminal, malicious, dishonest or fraudulent act, error or omission of any

---

[17] The third case had not been among the 21 pleaded in HN-INC's complaint, so was simply not at issue in this case.

[18] By the time the trial court ruled on the motion for summary adjudication, the *Wachtel* and *McCoy* cases had settled, so there was no issue of any continuing obligation to pay for defense costs.

Insured; however, the Insurer shall defend Claims alleging fraud, dishonesty, malicious or criminal acts, errors or omissions up until a judgment, ruling at law, finding in fact, plea bargain or plea of no contest, at which point the Insurer shall be reimbursed for the expenses incurred in defending such Claims; however, this exclusion shall not apply to any Insured who did not personally commit, participate in committing or personally acquiesce in or remain passive after obtaining personal knowledge of one or more acts, errors or omissions excluded herein."

The defendant insurers took the position that the discovery sanctions order in *Wachtel* constituted a "finding in fact" of a dishonest act—specifically, the federal court had deemed established the fact that HN had willfully used outdated databases in violation of the NJ regulation. The trial court below accepted this argument. As such, the exclusion was triggered. The trial court concluded that, as of December 6, 2006, the date of the discovery sanctions order, any duty to defend the "Claim" had terminated. And, as the trial court had already concluded that "Claim" refers to the entire lawsuit, the court concluded that all defense costs incurred in the consolidated *Wachtel* and *McCoy* actions after that date could not be recovered. The court explained that the exclusion "therefore, contemplates that a finding in fact of fraudulent or dishonest conduct terminates the insurer's duty to pay costs of defense for the entire judicial proceeding that encompasses the dishonest or fraudulent act, even if some portion of the judicial proceeding addresses separate wrongful acts that have not been determined to be dishonest or fraudulent." The trial court also concluded that the language of the exclusion provided that the insurers should be reimbursed for (or, as they had never initially paid, should be relieved from liability for) defense costs incurred prior to the December 6, 2006 finding in fact of dishonesty. The court was uncertain, however, as to whether HN-INC would be responsible for *all* of the pre-finding-of-dishonesty attorney fees, or merely the pre-finding-of-dishonesty attorney fees relating to the dishonest conduct. However, given the trial court's conclusion that the liability of the insurers for defense costs was limited to, at most, the pre-finding-of-dishonesty attorney fees relating to nondishonest conduct only, the court denied HN-INC's motion for summary adjudication.[19]

### b. *The Insurers' Motion for Summary Adjudication/Summary Judgment*

All four insurers responded with a motion for summary adjudication, arguing that they had no duty to defend or indemnify with respect to *Wachtel* and *McCoy*. As to the issue left open by the trial court's ruling on HN-INC's

---

[19] HN-INC sought to challenge this ruling by a petition for writ of mandate. We denied that petition as untimely.

motion for summary adjudication, the insurers argued that HN-INC was barred from recovering *any* defense costs in *Wachtel* and *McCoy*, on two bases. First, they argued that, as the trial court had concluded "Claim" means entire action, once a finding of dishonesty is made, it retroactively eliminates the obligation of the insurers to pay defense costs for the entire Claim. Second, they argued that, even if this interpretation were mistaken, the dishonesty exclusion applied to any Claim "arising out of" the dishonest act; and that, as a factual matter, all of the allegations in *Wachtel* and *McCoy* arose out of HN's dishonest act of willfully using outdated databases. Additionally, they argued other alternative bases for summary adjudication in their favor with respect to the *Wachtel* and *McCoy* actions, including other exclusions, and the theory that the damages sought in those cases were for unpaid policy benefits for which liability insurance was not available as a matter of law.

Simultaneous to this motion for summary adjudication, the two top-tier excess carriers, RLI and Lloyd's, moved for summary judgment. They argued that, if the insurers' joint motion for summary adjudication were granted, the alleged damages relating to the remaining underlying actions pleaded in HN-INC's complaint would be insufficient to reach their policies.[20]

The trial court granted all three motions. While the court relied on its earlier conclusion that "Claim," as used in the dishonest acts exclusion, refers to the entire action, the court also adopted the defendant insurers' argument that the *Wachtel* and *McCoy* actions both entirely "arose out of" the dishonest conduct of using outdated databases. The trial court stated that, "[a]lthough the relevant complaints articulate other reasons why the database used for UCR determinations was improper, the opinions of the federal district court make clear that use of outdated data became central to the litigation."

Judgment was entered in favor of RLI and Lloyd's. HN-INC filed a timely notice of appeal. AISLIC and ERSIC were permitted to intervene, and all four insurers filed a consolidated respondents' brief. Subsequent to oral argument in the appeal, the parties resolved their dispute regarding the remaining 19 underlying actions. As coverage for *Wachtel* and *McCoy* was the only disputed issue, the trial court entered summary judgment in favor of AISLIC and ERSIC, based on its earlier rulings. HN-INC filed a timely notice of appeal. The parties stipulated that the appeals should be consolidated, and that the appeal of the judgment in favor of AISLIC and ERSIC

---

[20] Indeed, even if the motion for summary adjudication were denied, the damages at issue in the remaining underlying actions added to the defense costs incurred in *Wachtel* and *McCoy* prior to the finding of dishonesty would be insufficient to reach Lloyd's policy. In other words, Lloyd's was entitled to summary judgment as a result of the trial court's ruling on HN-INC's motion for summary adjudication. Had Lloyd's obtained summary judgment at that time, the parties could have obtained immediate appellate review.

could be resolved on the record, briefing and argument in the appeal of the judgment in favor of RLI and Lloyd's. We accepted the stipulation, consolidated the cases on appeal, and now resolve both appeals in the instant opinion.

## ISSUES ON APPEAL

Although the parties raise many arguments in opposition to, and in favor of, the trial court's ruling, we resolve the appeal on three basic grounds: First, regardless of the applicability of any policy exclusions, the great bulk (although not all) of the claims in the *Wachtel* and *McCoy* actions were for policy benefits owed, which are simply not covered. Second, the trial court erred in concluding that "Claim," as used in the policy, applies to the entire lawsuit; thus, the trial court erroneously concluded that the dishonest acts exclusion barred recovery of defense or indemnity costs unrelated to the dishonest acts themselves. Finally, not all claims in *Wachtel* and *McCoy* arose out of the dishonest acts. As it appears that HN-INC can pursue certain limited claims for defense costs and indemnity arising from *Wachtel* and *McCoy*, the summary judgments in favor of the insurers must be reversed.[21]

## DISCUSSION

### 1. *Standard of Review*

" 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier* v. *Superior Court* (1986) 184 Cal.App.3d 1050, 1055 [229 Cal.Rptr. 374].) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064–1065 [225 Cal.Rptr. 203].)" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252 [38 Cal.Rptr.2d 65].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) We review orders granting or denying a summary judgment motion de novo.

---

[21] However, it is appears quite unlikely that the limited claims which HN-INC can pursue would reach the excess policies.

(*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72 [41 Cal.Rptr.2d 404]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].)

■ "As a question of law, the interpretation of an insurance policy is reviewed de novo under well-settled rules of contract interpretation. [Citation.] 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" ' [Citation.]" (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385].)

■ "Furthermore, policy exclusions are strictly construed [citations], while exceptions to exclusions are broadly construed in favor of the insured [citations]. ' "[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again 'any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.' [Citation.] Thus, 'the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.' [Citation.] The exclusionary clause 'must be *conspicuous, plain and clear.*' " [Citation.] This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded.' [Citation.]" (*E.M.M.I. Inc. v. Zurich American Ins. Co., supra*, 32 Cal.4th at p. 471.)

### 2. *Coverage for Claims Alleged in Underlying Actions*

■ "The first step in any insurance coverage dispute is to determine whether the insuring provisions of the policy afforded coverage for the alleged losses." (*Davis v. Farmers Ins. Group* (2005) 134 Cal.App.4th 100, 105 [35 Cal.Rptr.3d 738].) We therefore first determine whether coverage is afforded for the *Wachtel* and *McCoy* actions, before we turn to the possible applicability of any exclusions.

### a. *The Claims Fall Broadly Within the Coverage of the Policy*

As a preliminary matter, the claims alleged against HN in the *Wachtel* and *McCoy* actions appear to fall broadly within the scope of coverage. The AISLIC policy provides coverage for amounts for which the insured "shall become legally obligated to pay as Damages . . . resulting from any Claim or Claims first made against the Insured and reported to the Insurer during the Policy Period . . . for any Wrongful Act of the Insured." "Wrongful Act," in turn, is defined as "any actual or alleged breach of duty, breach of confidentiality, neglect, error, misstatement, misleading statement or omission, or series of continuous, repeated or related Wrongful Acts, committed solely in the conduct of the Insured's Professional Services as specified by the Named Insured in Endorsement #1 attached hereto." Endorsement #1 itemizes many professional services. One is entitled "HMO/PPO/Managed Health Care Professional Liability," which is defined to include "the review of health care costs including per unit prices, charges[,] fees, rates"; and another is "Utilization Review Services and Consulting," which includes "the process of evaluating the appropriateness, necessity, and/or cost of healthcare services for purposes of determining whether payment or coverage for such healthcare services will be authorized or paid for under any healthcare plan." It thus appears that the claims against HN in the *Wachtel* and *McCoy* actions, which generally arise out of HN's adjustment of ONET claims, allege Wrongful Acts within the scope of coverage of the policy.

### b. *The Claims Seeking Unpaid Policy Benefits Are Not Covered*

However, the insurers assert that the bulk of the damages sought by the *Wachtel* and *McCoy* classes are unpaid benefits under their health plans, which, it is argued, are not covered by the policy.[22] We agree.

We repeat the key policy language. Coverage applies only to amounts the insured "shall become legally obligated to pay as Damages . . . resulting from any Claim or Claims . . . for any Wrongful Act of the Insured." A Wrongful Act, in turn, is described as "any actual or alleged breach of duty, breach of confidentiality, neglect, error, misstatement, misleading statement or omission . . . ."[23] The question, then, becomes if benefits due insureds under their health plans are amounts the insurer is legally obligated to pay *as the result of a Wrongful Act*, or if they are amounts the HN entities are obligated

---

[22] The insurers argue that the damages sought are uninsurable restitution, or, in the alternative, contractual damages uninsurable as a moral hazard. We believe, however, that the proper approach in this case is to determine whether the benefits sought in the underlying actions are covered under the provisions of the policy's insuring clause that we have quoted above.

[23] The language refers to a breach of *duty*, not a breach of *contract*.

to pay their insureds *by contract*, independent of any Wrongful Act. "[A]n insured's alleged or actual refusal to make a payment under a contract does not give rise to a loss caused by a wrongful act." (*August Entertainment, Inc. v. Philadelphia Indemnity Ins. Co.* (2007) 146 Cal.App.4th 565, 578 [52 Cal.Rptr.3d 908].) "As noted in a leading treatise: 'Professional liability policies often contain an exclusion for "[a]ny 'claim' arising out of a breach of contract, or out of liability assumed under any contract or agreement." *Even in the absence of an express exclusion*, courts have held that a claim alleging breach of contract is not covered under a professional liability policy because there is no "wrongful act" and no "loss" since the insured is simply being required to pay an amount it agreed to pay.' [Citation.]" (*Id.* at p. 579.) That is to say, regardless of whether HN committed any wrongful act in its use of the Ingenix databases, its use of outdated databases, and its non-Ingenix adjustment misconduct, the fact remains that HN was *contractually obligated to pay its participants and beneficiaries the full benefits to which they were entitled under their health plans*. These costs cannot be passed on to HN's insurers simply because HN may have committed a wrongful act in its failure to pay them.[24] In short, "[p]erformance of a contractual obligation . . . is a debt the [insured] voluntarily accepted. It is not a loss resulting from a wrongful act within the meaning of the policy." (*Id.* at pp. 581–582.)

■ This analysis has specifically been applied in the context of the failure to pay benefits required under ERISA. (*Pacific Ins. Co., Ltd. v. Eaton Vance Management* (1st Cir. 2004) 369 F.3d 584, 590 [mistaken failure to fund a profit-sharing plan is not a covered loss, as the obligation to fund the plan independently existed].) The fact that the breach of the contractual obligation may itself have been negligent also does not render it a covered wrongful act. (*Baylor Heating & Air Conditioning, Inc. v. Federated Mutual Ins. Co.* (7th Cir. 1993) 987 F.2d 415, 419–420 [negligent failure to properly fund a pension plan is not a covered wrongful act].) The inquiry is not one of motives, but contractual liability. "Although at the time [the insured] refused to make fund payments it did not believe it had any contractual obligation to do so, these beliefs do not change the contractual nature of the obligation." (*Id.* at p. 419.) This conclusion holds even when the benefits unpaid under the plan were required not by the express language of the plan, but by ERISA,

---

[24] In passing, HN-INC suggests that the fact that the settlement agreement "may have included a monetary payment to resolve a disputed claim does not establish that such amounts were owed under a contract." But we determine coverage by focusing on the allegations of the underlying actions. To the extent the underlying actions sought coverage for unpaid benefits, the underlying actions were not covered by the policy—thus no amounts paid to settle those claims were covered by the policy. An insured cannot transform an uncovered contract claim into a potentially covered one simply by settling it prior to any decision being made on its merits.

because ERISA plans simply include terms implied by law. (*The May Dept. Stores Co. v. Federal Ins. Co.* (7th Cir. 2002) 305 F.3d 597, 601.)[25]

 It is important to recognize that California law makes no distinction as to the insurability of damages based on whether the causes of action alleged in the underlying action are specifically pleaded in tort or contract. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 838–839 [88 Cal.Rptr.2d 366, 982 P.2d 229].) Instead, "[t]he nature of the damage and the risk involved, in light of particular policy provisions, control coverage." (*Id.* at p. 839.) Thus, when an insured lessee was sued in nuisance, negligence, and trespass, for contaminating the leasehold property, the fact that its contamination of the property was *also* alleged to breach the lease did not render the claim an uninsured breach of contract. (*Id.* at pp. 825, 841.) Similarly, when an insured was sued for negligence and breach of fiduciary duty arising out of its default on a bond obligation, the claim was held to arise out of a breach of contract, regardless of the fact that no breach of contract cause of action was actually pleaded.[26] (*Medill v. Westport Ins. Corp.* (2006) 143 Cal.App.4th 819, 829 [49 Cal.Rptr.3d 570].) We consider the nature of the damage and the risk involved, not the name of the causes of action pleaded.

We thus turn to the nature of damages and the risk involved in *Wachtel* and *McCoy*. In the *Wachtel* complaint, the first cause of action is for "Breach of Contract and Other Relief Under ERISA § 502(a)(1)(B)." The identified section of ERISA provides that a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." (29 U.S.C. § 1132(a)(1)(B).) To the extent that this cause of action seeks damages,[27] it largely seeks the benefits due under the plan. In one small respect, it may seek additional damages. The *Wachtel* plaintiffs plead that HN "should be compelled to pay the provider's actual charge in every instance in which [HN entities] were obligated to

---

[25] In *May Dept. Stores*, the insurance policy had an express clause excluding coverage for benefits due under the insured's ERISA plan. (*The May Dept. Stores Co. v. Federal Ins. Co., supra*, 305 F.3d at p. 600.) This does not render the case distinguishable. It is relevant for our purposes not because it excludes coverage for plan benefits, but because it holds that a failure to pay benefits *required by ERISA* is nonetheless a failure to pay *plan* benefits.

[26] HN-INC argues that holding a lack of coverage for the failure to pay plan benefits violates ERISA, because the failure to pay plan benefits is a breach of fiduciary duty under ERISA (29 U.S.C. § 1104(a)(1)(D)) and ERISA specifically permits a fiduciary to obtain insurance to cover liability for breach of ERISA fiduciary duties. (29 U.S.C. § 1110(b)(2).) But we look to the nature of the claim asserted, not the cause of action pleaded, and here, the nature is a failure to pay benefits. In any event, we are not stating that a health insurer could *not* obtain a surety policy to guarantee its performance under its ERISA plans; we only conclude that HN did not do so here.

[27] The AISLIC policy indisputably excludes coverage for claims seeking nonpecuniary relief.

comply with the [NJ regulation] or [NJ regulations] generally and failed to do so." To the limited extent that the "provider's actual charge" sought exceeds the benefits contractually due,[28] the *Wachtel* plaintiffs seek relief in excess of contractual damages, which is potentially covered by the policy.

█ The *Wachtel* plaintiffs' second cause of action is for breach of fiduciary duties, including failure to provide necessary disclosures and full and fair review. The *Wachtel* plaintiffs largely seek injunctive relief in this cause of action. However, they also reference 29 United States Code section 1132(c), which provides that any plan administrator who fails to furnish required information to a participant or beneficiary "may . . . be personally liable to such participant or beneficiary in the amount of up to $100 a day" from the date of failure.[29] HN argues that this penalty is not a civil penalty, which would concededly be excluded from coverage,[30] but a liquidated damages provision, which would be covered. We disagree. Preliminarily, we note that the Employee Benefits Security Administration of the Department of Labor referred to this amount as a "civil monetary penalty" in a regulation adjusting the maximum amount. (29 C.F.R. § 2575.502c-1 (2011).) Moreover, it appears that a plan administrator may be required to pay this amount *not* in order to compensate the beneficiary for the loss suffered by not being furnished the required information, but, instead, in order to penalize the plan administrator for failing to comply with the duty to disclose it. HN relies on language in *Varity Corp. v. Howe* (1996) 516 U.S. 489 [134 L.Ed.2d 130, 116 S.Ct. 1065], in which the Supreme Court, in setting out the language of 29 United States Code section 1132, paraphrased the relevant language in brackets as "[providing for liquidated damages for failure to provide certain information on request]." (*Varity Corp. v. Howe, supra*, 516 U.S. at p. 507.)

---

[28] The defendant insurers argue that the *only* monetary relief available under the pleaded subdivision of ERISA is contractual. The issue is not so clear cut. In *CIGNA Corp. v. Amara* (2011) 563 U.S. ___ [179 L.Ed.2d 843, 131 S.Ct. 1866], the Supreme Court stated that while ERISA section 502(a)(1)(B) authorizes monetary recovery for only plan benefits (29 U.S.C. § 1132(a)(1)(B)), ERISA section 502(a)(3), which authorizes appropriate equitable relief (29 U.S.C. § 1132, subd. (a)(3)(B)), may include all remedies traditionally available in equity, including monetary compensation for a trustee's breach of duty. (*CIGNA Corp. v. Amara, supra*, 563 U.S. at pp. ___, ___ [131 S.Ct. at pp. 1878, 1880].) While it is true that the first cause of action in *Wachtel* sought damages only under ERISA section 502(a)(1)(B), the allegations of the first cause of action were incorporated into the second, which sought relief under ERISA section 502(a)(3) for breach of HN's fiduciary duties. It is not at all clear if the *Wachtel* plaintiffs actually sought extracontractual monetary damages under the equitable relief provision of ERISA, nor is it clear if such damages are legally recoverable under that provision. Nonetheless, as we are simply considering the allegations of the complaint, where it appears that extracontractual damages were sought (and would be recoverable), coverage is not barred for such damages.

[29] The penalty has been increased to $110, by regulation. (29 C.F.R. § 2575.502c-1 (2011).)

[30] The definition of "Damages" in the policy expressly excludes "civil or criminal fines or penalties imposed by law," except for two specifically enumerated ERISA civil penalties not at issue here.

As this provision was not at issue in the case, the court's shorthand paraphrase of its language constitutes dicta, at best. Instead, courts which have actually addressed the issue have held that the provision imposes a civil penalty. (See, e.g., *Groves v. Modified Retirement Plan* (3d Cir. 1986) 803 F.2d 109, 111 (*Groves*); *UnitedHealth Group Inc. v. Hiscox Dedicated Corporate Member Ltd., supra*, 2010 WL 550991 at pp. *8–*9.)[31] We agree with these courts and conclude that the provision imposes a penalty, which is therefore not covered.

In addition to uncovered injunctive relief and the uncovered civil penalty, the *Wachtel* plaintiffs seek, in their second cause of action, compensatory damages "in an amount to be determined at trial" for disclosure violations. To the limited extent this cause of action seeks extracontractual damages, it could potentially fall within the scope of coverage.

■ The *Wachtel* plaintiffs also seek an award of reasonable attorney fees. Indeed, ERISA provides for an award of such fees in an action by a plan participant or beneficiary. (29 U.S.C. § 1132(g)(1).) Relying on the analysis of *UnitedHealth Group Inc. v. Hiscox Dedicated Corporate Member Ltd., supra*, 2010 WL 550991 at pp. *18–*19, HN-INC argues that the claim for attorney fees was *itself* a claim for damages, and therefore, covered by the policy, regardless of whether the underlying claims which were alleged to justify the award of attorney fees were themselves covered. We disagree.[32] The insuring clause provides that the insurers shall pay on behalf of the insured "all sums which the Insured shall become legally obligated to pay as Damages . . . resulting from any Claim . . . for any Wrongful Act of the Insured . . . ." ■ An award of attorney fees does not compensate a plaintiff for the injury that brought the plaintiff into court; attorney fees are

---

[31] The Ninth Circuit, in *Stone v. Travelers Corp.* (9th Cir. 1995) 58 F.3d 434, disagreed with *Groves*. In *Stone*, the court held that, for statute of limitations purposes, the $100 per day provision at issue is not a penalty or forfeiture. (*Id.* at pp. 438–439.) However, the California Court of Appeal, in *Prudential Home Mortgage Co. v. Superior Court* (1998) 66 Cal.App.4th 1236 [78 Cal.Rptr.2d 566], disagreed with *Stone*. Although a different statute was at issue in the California case, the California court rejected the Ninth Circuit's analysis as "puzzling" and out of step with "a long line of California cases" holding that, for statute of limitations purposes, statutes providing for "recovery of statutory damages calculated without reference to actual harm" are, in fact, penal provisions. (*Id.* at p. 1245.)

[32] Preliminarily, we note that HN-INC's argument is based on a misstatement of the record. HN-INC represents that it was ultimately ordered to pay $70 million in class counsel's attorney fees over and above the settlement amount; it seeks coverage for the additional award. But the award of attorney fees was part of the settlement; it was an amount awarded class counsel out of the recovery counsel had obtained for the class. If we adopted HN-INC's argument, a class action settlement for uncovered claims would nonetheless be insurable to the extent of the fee awarded class counsel out of the settlement. The insured wrongdoer would be in the unusual position of arguing for an increased multiplier for the award of fees to class counsel, as such a result would increase the percentage of the settlement amount which would nevertheless be indemnified by its insurer. This cannot be the law.

inconsistent with the meaning of the word "Damages" in the ordinary and popular sense. (*Cutler-Orosi Unified School Dist. v. Tulare County School etc. Authority* (1994) 31 Cal.App.4th 617, 632 [37 Cal.Rptr.2d 106].) We conclude that if the entire action alleges no covered wrongful act under the policy, coverage cannot be bootstrapped based solely on a claim for attorney fees. Likewise, if a complaint alleges some covered wrongful acts and some acts which are not covered, the claim for attorney fees is covered only to the extent it arises out of the covered wrongful acts.

In sum, in the *Wachtel* action, there is no coverage for the plaintiffs' claims seeking (1) unpaid benefits; (2) equitable relief; (3) civil penalties; or (4) attorney fees arising out of those claims. There is a potential for coverage for the plaintiffs' claims to the extent they seek (1) extracontractual damages for failure to comply with NJ regulations; (2) extracontractual damages for the failure to comply with the duty to disclose; and (3) attorney fees arising out of those claims.

Having discussed these principles with respect to *Wachtel*, it is a simple matter to apply them to *McCoy*. In *McCoy*'s operative complaint, the first cause of action is for breach of contract under ERISA; the plaintiffs seek "unpaid benefits, recalculated deductible and coinsurance amounts, interest, attorney's fees, and other penalties as this Court deems just, under . . . 29 U.S.C. § 1132(a)(1)(B)." Nothing sought in this cause of action is covered under the policy. The second cause of action is for failure to provide full and fair review; it expressly seeks "statutory penalties, and injunctive and declaratory relief." Nothing sought in this cause of action is covered under the policy. The third cause of action is for failure to provide disclosures. This cause of action seeks the civil penalty under 29 United States Code section 1132(c) and injunctive relief, which are not covered, and claims damages "in an amount to be determined at trial," which potentially is covered. The fourth cause of action, for breach of fiduciary duty, and the fifth cause of action, for violation of claims procedure provisions, seek injunctive remedies only, which are not covered. Thus, the only potentially covered claims in the *McCoy* action are the claim for extracontractual damages for failure to provide disclosures and the claim for attorney fees arising therefrom.

As there are some potentially covered claims alleged in both *Wachtel* and *McCoy*, we consider the applicability of the dishonest acts exclusion. However, as the trial court's ruling on the dishonest acts exclusion was driven, in large part, by the court's interpretation of the word "Claim," as it applied to the duty to reimburse for defense costs, we must first address that issue.

### 3. *"Claim" and the Duty to Reimburse for Defense Costs*

The main policy language provides that "[u]pon written notice of a Claim, [the insurer shall] defend any Claim or Law Suit brought against the Insured alleging a Wrongful Act, even if such Claim or Law Suit is groundless, false or fraudulent." However, the "Choice of Counsel Endorsement" removes that language and replaces it. Under the endorsement, "[u]pon written notice of a Claim, [the insurer shall] have the right but not the duty to defend any Claim or Law Suit brought against the Insured alleging a Wrongful Act, even if such Claim or Law Suit is groundless, false or fraudulent." Similarly, where the initial duty-to-defend language provides that the insurer shall "[p]ay all Defense Costs incurred by the Insured in excess of the Insured's self-insured retention in defense of any Claim or Law Suit brought against the Insured alleging a Wrongful Act . . . ," the endorsement replaces this language with the obligation to "[r]eimburse the Insured all reasonable and customary Defense Costs incurred by the Insured in excess of the Insured's self-insured retention in defense of any Claim or Law Suit brought against the Insured alleging a Wrongful Act . . . ."

By comparing the language relating to the duty to defend in the main policy and the Choice of Counsel Endorsement, it is clear that although there are differences as to which party pays for counsel's services, chooses counsel, and controls the defense, both provisions are *triggered* in the same circumstances. That is to say, the sole differences between the triggering language of the two provisions are (1) the duty to defend provides that the insurer *shall* defend any specified claim, while the endorsement provides that the insurer *has the right but not the duty* to defend the same specified claims and (2) the duty to defend provides that the insurer shall *pay* certain identified defense costs, while the endorsement provides that the insurer shall *reimburse the insured* for those same specified[33] defense costs. Both provisions apply to the same claims and defense costs.

#### a. *The Endorsement Provision Imposes a Duty to Reimburse Defense Costs for Potentially Covered Claims, Not Just Actually Covered Claims*

As the policy language contained in the aforesaid endorsement changes the insurer's duty from an obligation to provide a defense and to pay the related defense costs into a duty to reimburse "all reasonable and customary" defense costs, the insurers take the position that the language is governed by case law

---

[33] To be sure, the duty to defend applies to "all Defense Costs incurred . . ." while the duty to reimburse applies only to "all reasonable and customary Defense Costs incurred . . . ." However, as the policy *defines* "Defense Costs" as those which are "reasonable and necessary," we see little, if any, difference.

interpreting the duty to reimburse often implied in directors and officers (D&O) liability policies. The insurers make this argument because the duty to reimburse in such policies is limited to defense costs related to *actually covered* claims, as opposed to defense costs related to *potentially covered* claims. The argument is unavailing.

In D&O policies, there is generally no duty to defend clause. Instead, defense costs are defined as part of "Damages" for which indemnification is to be paid.[34] (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2011) ¶ 7:514, p. 7B-7 (rev. # 1, 2011).) In that situation, the "contractual language limits reimbursement to costs incurred in the defense of claims that would be insurable under the [p]olicies." (*Pan Pacific Retail Properties, Inc. v. Gulf Ins. Co.* (9th Cir. 2006) 471 F.3d 961, 970.) In other words, in the absence of a contractual duty to defend, when defense costs are recoverable *only* as covered losses, only those defense costs which were actually related to the defense of covered claims may be reimbursed.

That is not the case here. While the Choice of Counsel Endorsement changed the *timing* of the payment of defense costs, it did not change the *scope* of the duty to defend which appeared in the main body of the policy. Both the initial, superseded, duty to defend and the endorsement's duty to reimburse apply to "Defense Costs incurred by the Insured in excess of the Insured's self-insured retention in defense of any Claim or Law Suit brought against the Insured alleging a Wrongful Act." The endorsement simply changed the obligation from an obligation to pay into an obligation to reimburse. As such, it did not narrow the scope of the obligation from a duty to pay defense costs related to potentially covered claims into a duty to pay only those related to actually covered claims. In this case, as in a traditional "duty to defend" case, the scope of the insurer's duty is defined as defense costs incurred "in defense of any Claim or Law Suit brought against the Insured *alleging a Wrongful Act . . . .*" (Italics added.) As such, the insurer is obligated to defend a claim for potentially covered claims, not merely actually covered claims. (*Buss v. Superior Court, supra*, 16 Cal.4th at p. 49.)

> b. *"Claim," as Used in the Policy, Does Not Refer to the Entire Lawsuit*

We now turn to the issue of the scope of the duty to defend/reimburse. By law, an insurer that has a duty to defend potentially covered claims is required, as a prophylactic measure, to defend the entire action. (*Buss v. Superior Court, supra*, 16 Cal.4th at pp. 48–49.) However,

---

[34] Indeed, the instant policy does define "Damages" to include "Defense Costs." However, as we shall discuss, the presence of the additional duty to defend clause and Choice of Counsel Endorsement distinguish this insurance policy.

since the duty to defend claims which are not potentially covered is implied by law, not required by contract, the insurer may seek reimbursement for the defense costs related solely to the defense of those claims. (*Id.* at pp. 50–51.) Importing this analysis into a policy with the duty to reimburse, rather than defend, and the procedural posture of the underlying action having been concluded by settlement, the insurer would have a duty to reimburse for defense costs incurred *only* in the defense of potentially covered claims.

The rule would only be different if the parties had provided for a different rule in the policy itself. It is suggested that this is such a policy, in that it expressly provides for a duty to defend *an entire action*, as long as the action seeks damages for a covered claim. We disagree.

 We begin with the language of the policy, which provides a duty to defend/reimburse for "any Claim or Law Suit brought against the Insured alleging a Wrongful Act." As our Supreme Court explained, with regard to similar language, the duty to defend "goes to an action *seeking damages for a covered claim.* It must therefore be read to embrace the action *to the extent that it seeks such damages.* So read, it accords with the general rule, set out above, that the insurer has a duty to defend as to the claims that are at least potentially covered, but not as to those that are not." (*Buss v. Superior Court, supra*, 16 Cal.4th at p. 49.) Indeed, the dissent in *Buss* took the position that the policy language at issue provided that the insurer would " 'defend *any "suit"* seeking [covered] damages,' " which therefore expressly required defense of the entire action. (*Id.* at p. 63 (dis. opn. of Kennard, J.).) The majority clearly rejected this analysis in its conclusion that the promise to defend any suit seeking covered damages was, in fact, *a promise to defend the suit to the extent it sought covered damages.*[35]

That the policy defines "Claim," to include a "judicial . . . proceeding," does not change our result. The full definition of "Claim" indicates that it is meant to identify only the *time* when policy duties arise. This is a claims-made-and-reported policy; coverage itself is determined by the date of a "Claim . . . first made." Thus, "Claim" is defined in a way to indicate when notice of a third party's claim for damages has become certain enough to trigger the policy. Thus, "Claim" is defined as: "1. any judicial, administrative or arbitration proceeding initiated against one or more Insureds in which such Insured(s) may be subjected to a binding adjudication of liability for monetary Damages sustained by a third party as [a] result of the Insured's

---

[35] In its petition for rehearing, HN-INC argues that, as the policy provides a duty to defend/reimburse for any "Claim or *Law Suit* brought against the Insured alleging a Wrongful Act" (italics added), the policy expressly provides a duty to defend/reimburse for the entire lawsuit, not merely the potentially covered claims within the lawsuit. As we have discussed above, this argument was found persuasive to the *Buss* dissent, but rejected by the *Buss* majority.

rendering or failing to render Professional Services; [¶] 2. any written notice from a third party that it is the intention of such third party to hold one or more Insureds responsible for Damages to said third party arising out of those Professional Services; or [¶] 3. any written notice by a third party of a circumstance involving actual and/or alleged Wrongful Acts of an Insured in rendering or failing to render Professional Services that may reasonably be expected to give rise to a Claim for Damages in the future." Again, this language is concerned with the temporal certainty of the "Claim"; it does not speak to its scope.

 Moreover, interpreting "Claim" to mean *"entire* action" would either result in numerous unreasonable interpretations of other terms in the policy, or "run afoul of the rule of contract interpretation that the same word used in an instrument is generally given the same meaning unless the policy indicates otherwise. [Citations.]" (*E.M.M.I. Inc. v. Zurich American Ins. Co., supra,* 32 Cal.4th at pp. 475–476.) For example, all exclusions in the policy begin with the language "This policy does not apply to any Claim . . . ." One such exclusion goes on to state, "seeking non-pecuniary relief." If "Claim" were read to mean *"entire* action," the policy would exclude coverage for an entire lawsuit if it contained a single cause of action for declaratory relief. Clearly, this exclusion must be read to apply to a claim only to the extent that it seeks nonpecuniary relief. Similarly, the dishonest act exclusion, which we will address below, begins with the language that it "does not apply to any Claim . . . arising out of or alleging any . . . dishonest . . . act," yet ends with the language that it does not apply to any insured who did not participate in, or remain passive after obtaining knowledge of, "one or more acts, errors or omissions excluded herein." This latter language demonstrates that, despite the fact that the exclusion applies to a "Claim," it is only the specified dishonest "act[s], errors[,] or omissions" that are actually excluded. Again, this supports the conclusion that "Claim" does not mean "entire action," but is in fact limited to the relevant claims within the action.[36]

4. *The Dishonest Acts Exclusion Does Not Apply to the Entirety of* Wachtel *and* McCoy

With "Claim" properly defined, we now turn to the scope of the dishonest act exclusion. It provides: "This policy does not apply to any Claim: (a) arising out of or alleging any criminal, malicious, dishonest or fraudulent act,

---

[36] The insurers suggest that, if there were, in fact, multiple "Claims" at issue in the *Wachtel* and *McCoy* actions, each individual "Claim" would be subject to the policy's self-insured retention of $500,000. The argument is meritless. The policy provides that "[a] single retention amount shall apply to each Wrongful Act, or the same, continuous, related or repeated Wrongful Act(s)." In this case, it certainly can be argued that all of the wrongful acts are related, in that they all arise from HN's practices used in adjusting ONET claims.

error or omission of any Insured; however, the Insurer shall defend Claims alleging fraud, dishonesty, malicious or criminal acts, errors or omissions up until a judgment, ruling at law, finding in fact, plea bargain or plea of no contest, at which point the Insurer shall be reimbursed for the expenses incurred in defending such Claims; however, this exclusion shall not apply to any Insured who did not personally commit, participate in committing or personally acquiesce in or remain passive after obtaining personal knowledge of one or more acts, errors or omissions excluded herein."

■ Preliminarily, we note that, as this policy replaced the duty to defend with a duty to reimburse, this exclusion does not recreate a duty to defend when there is an allegation of dishonesty. Instead, we read the exclusion to provide that, if there is a finding in fact of a dishonest act, there is no duty for the insurer to reimburse for *any* defense costs of the claim (either before or after the finding in fact) to the extent the claim arose out of the dishonest act.

HN-INC argues that the federal court's discovery order deeming established the fact that HN willfully used outdated databases is not a "finding in fact" sufficient to trigger the application of this exclusion (and, further, that there is a triable issue of fact whether that finding encompassed HN-INC). Assuming, without deciding, that the federal court's order does constitute a finding in fact of a dishonest act, it is clear from this record that all of the allegations in *Wachtel* and *McCoy* did *not*, in fact, arise out of that dishonest act.

■ "As used in various types of insurance provisions, the term 'arising out of' links a factual situation with the event creating liability and does not import any particular standard of causation or theory of liability into an insurance policy. [Citation.] Rather, ' " ' "[a]rising out of" are words of much broader significance than "caused by." They are ordinarily understood to mean "originating from[,]" "having its origin in," "growing out of" or "flowing from" or in short, "incident to, or having connection with". . . .' " ' " (*Davis v. Farmers Ins. Group, supra*, 134 Cal.App.4th at pp. 106–107.)

In this case, the dishonest act found by the federal court is HN's knowing and willful use of outdated data. While some of the claims of *Wachtel* and *McCoy* arose out of this misconduct, many others did not. Claims seeking unpaid benefits due to the use of outdated data, claims based on the failure to disclose the use of outdated data, and claims based on the failure to provide a full and fair review for claim denials based on the use of outdated data clearly had their origin in HN's use of the outdated data. However, claims having their origin in the systematic flaws in the Ingenix databases, and claims having their origins in non-Ingenix adjustment misconduct do not. While all of the claims in *Wachtel* and *McCoy* may fall under the same

umbrella of misconduct in the adjustment of ONET claims (see fn. 36, *ante*), not all claims originated out of the use of *outdated data*. Indeed, at the time the *Wachtel* complaint was originally tendered to the insurers for a defense, there were *no* allegations arising out of the use of outdated data. Moreover, in approving the settlement in *Wachtel* and *McCoy*, the federal court specifically indicated that the systematic flaws in the Ingenix databases would have to be addressed in order for the settlement to be deemed fair, reasonable, and adequate. Thus, it is clear that the allegations of systematic flaws in the Ingenix databases were an important element of the underlying actions.

As discussed above, the *Wachtel* and *McCoy* complaints, to a limited degree, sought damages which are covered under the policies. For example, they sought extracontractual damages for breach of HN's obligation to make disclosures. To the extent the disclosure failures relate to the use of outdated data, these claims may be subject to the exclusion. However, to the extent such disclosure failures relate to the systematic flaws in the Ingenix databases and non-Ingenix adjustment misconduct, they are not. Thus, the dishonest act exclusion does not preclude coverage for the entirety of the potentially covered claims in the *Wachtel* and *McCoy* actions.[37]

## CONCLUSION

We can only affirm the summary judgments in favor of the insurers if it can be established, as a matter of law, that there is no coverage for defense costs or indemnity for the entirety of the *Wachtel* and *McCoy* actions. It appears that there is no coverage for the vast bulk of the claims asserted in these actions. Specifically, there is no coverage for the actions to the extent they sought (1) unpaid benefits; (2) injunctive relief; (3) civil penalties; (4) damages arising out of claims subject to the willful act and other policy exclusions; and (5) attorney fees arising out of any of the above. However, claims for relief outside the scope of those categories are potentially covered, and no policy exclusion completely bars coverage for those claims. Thus, we must reverse the summary judgments and remand with directions to the trial court to determine whether and to what extent there is any merit to the claim of coverage for such potentially covered matters.

---

[37] A similar analysis applies to the other arguments on which the insurers rely, including the exclusion for claims based on knowing misconduct; the exclusion for the gaining of personal profit to which the insured is not legally entitled; and Insurance Code section 533 (precluding insurance for willful acts).

## *DISPOSITION*

The summary judgments in favor of AISLIC, ERSIC, RLI and Lloyd's are reversed and the matter is remanded for conduct of further proceedings consistent with the views expressed herein. Each party is to bear its own costs on appeal.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied June 12, 2012, and the opinion was modified to read as printed above.